UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

------------------------------------------------x
                               :

**In re**                         :         **Chapter 11**
                               :

**VITAMIN WORLD, INC.,** *et al,*     :       **Case No. 17-11933 (___)**
                               :

          **Debtors.**[1]             :       **Joint Administration Requested**
                               :
                               :
------------------------------------------------x

## DECLARATION OF FRANK CONLEY IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Frank Conley, hereby declare under penalty of perjury,

1.       I am the Chief Financial Officer of Vitamin World, Inc. ("**Retail**"), VW Online, Inc. ("**Online**"), Precision Engineered Limited (UBS) ("**Precision Engineered**"), Vitamin World (V.I.), Inc. ("**VW Virgin Islands**"), Vitamin Depot, LLC ("**Vitamin Depot**"), Vitamin World of Guam, LLC ("**VW Guam**"), and Nutrition Warehouse, Inc. ("**Nutrition Warehouse**") and have knowledge from such positions regarding VWRE Holdings, Inc. ("**RE Holdings**") and VW Interholdings, Inc. ("**Interholdings**" and together with Retail, Online, Precision Engineered, VW Virgin Islands, Vitamin Depot, VW Guam, Nutrition Warehouse, and RE Holdings, "**Debtors**").[2] I am generally familiar with Debtors' day-to-day operations, business affairs, and books and records.

---

[1]      The last four digits of each Debtor's federal tax identification number, are: Vitamin World, Inc. (2283); VWRE Holdings, Inc. (8915); VW Interholdings, Inc. (4744); VW Online, Inc. (8763); Precision Engineered Limited (USA) (0916); Vitamin World (V.I.), Inc. (9839); Vitamin Depot, LLC (6747); Vitamin World of Guam, LLC (2056); and Nutrition Warehouse, Inc. (5095). Debtors' mailing address is 4320 Veterans Highway, Holbrook, NY 11741.

[2]      Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Motion (as hereinafter defined).

2.      On the date hereof (the "**Petition Date**"), Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") (collectively, these "**Chapter 11 Cases**").

3.      Debtors are operating their business and managing their property as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed by the Office of the United States Trustee.

4.      In order to enable Debtors to minimize the adverse effects of the commencement of the Chapter 11 Cases on their business operations, Debtors have requested various types of relief in certain "first day" motions (each, a "**First Day Motion**" and collectively, the "**First Day Motions**"). The First Day Motions seek relief aimed at, among other things: (a) preserving customer relationships; (b) maintaining vendor confidence and employee morale; (c) ensuring the continuation of Debtors' cash management system and other business operations without interruption; (d) securing post-petition financing necessary to continue Debtors' operations; (e) establishing certain administrative procedures to facilitate a smooth transition into, and uninterrupted operations throughout, the chapter 11 process. Gaining and maintaining the support of Debtors' customers, employees, vendors and suppliers, and certain other key constituencies, as well as maintaining Debtors' day-to-day business operations with minimal disruption, will be critical to the success of these Chapter 11 Cases and Debtors' reorganization efforts.

5.      I submit this declaration (this "**Declaration**") in support of the First Day Motions. I am familiar with the contents of each First Day Motion (including the exhibits thereto), and I believe that the relief sought in each First Day Motion (i) is necessary to enable Debtors to

operate in chapter 11 with minimum disruption or loss of productivity or value; (ii) constitutes a critical element in achieving a successful bankruptcy process; and (iii) is in the best interests of Debtors, their estates and creditors.

6.      Except as otherwise indicated, all facts set forth in this Declaration are based on my personal knowledge, on information supplied to me by other members of Debtors' management teams and/or professionals retained by Debtors, on information learned from my review of relevant documents, or on my opinion based upon my experience and knowledge of Debtors' operations, financial condition, and present liquidity needs. If I were called upon to testify, I could and would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of each Debtor.

7.      Part I of this Affidavit provides an overview of Debtors' business operations and describes Debtors' corporate history and prepetition capital and debt structure and the circumstances surrounding the commencement of these Chapter 11 Cases. Part II sets forth the relevant facts in support of each of the First Day Motions.

<b><u>PART I</u></b>

**A.      <u>Corporate Structure</u>**

8.      In February 2016, CLP VW Holdings, LLC ("**CLP**") acquired Retail and its subsidiaries from NBTY, Inc., a Delaware corporation ("**NBTY**"). To effect the transaction, a new holding company, RE Holdings, was created. RE Holdings purchased a warehouse building located in Holbrook, New York from NBTY. RE Holdings indirectly acquired the stock of Retail and caused Online to purchase the assets of the e-commerce site and internet business of Vitamin World Online, Inc. Included in the purchase consideration was cash, a promissory note issued by RE Holdings to NBTY in the original principal amount of $15,000,000 dated as of

3

February 16, 2016 (the "**Seller Note**") and a warrant to purchase shares of RE Holdings issued to NBTY.

9.      Debtors' current corporate structure is as follows.  RE Holdings is a privately held company incorporated in Delaware.  It directly or indirectly owns all of the equity in the following 8 direct and indirect subsidiaries, each of which is a Debtor: (a) VW Interholdings, a Delaware corporation wholly owned by RE Holdings, which serves as an intermediate holding company; (b) Retail, a Delaware corporation wholly owned by Interholdings, which operates Debtors' retail stores, (c) Online, a Delaware corporation wholly owned by Interholdings, which operates Debtors' e-commerce business, (d) Precision Engineered, a Delaware corporation wholly owned by Retail, which is essentially a brand name for Debtors, (e) Vitamin Depot, a Delaware limited liability company wholly owned by Retail, which manages Debtors' wholesale distribution operations, (f) VW Guam, a Delaware limited liability company wholly owned by Retail, which owns and operates Vitamin World stores located in Guam, (g) VW Virgin Islands, a USVI corporation wholly owned by Retail, which owns and operates Vitamin World stores located in the U.S. Virgin Islands, and (h) Nutrition Warehouse, a New York corporation wholly owned by Retail, which owns and operates Debtors' factory stores in Sparks, Nevada and Bohemia, New York (the "**Factory Stores**").  A chart illustrating Debtors' corporate structure is attached hereto as **Exhibit A**.

**B.    Debtors' Operations**

10.      Debtors are a leading specialty retailer in the vitamins, minerals, herbs and supplements ("**VMHS**") market.  Debtors offer customers products across all major VMHS and sports nutrition categories, including, supplements, active nutrition, multiples, letter vitamins, health and beauty, herbs, minerals, food and specialty items.

4

11.     Debtors source their ingredients from business partners across the United States. The ingredients are used to create supplements and are packaged and distributed to customers. Debtors are currently operating out of four distribution centers.  The distribution centers are located in: Holbrook, New York; Sparks, Nevada; Riverside, California and Groveport, Ohio. Debtors are currently operating approximately 334 retail stores that are mostly located in malls and outlet centers across the United States and its territories.  Debtors are headquartered in Holbrook, New York. Debtors also sell their products online.

12.     Debtors employ a total of approximately 1,478 active employees in their 334 retail locations, support center, and management offices.  Senior management of Debtors' operations includes Michael Madden, as president and chief executive officer, myself as chief financial officer, Julian Van Erlach as senior vice president of supply chain, Vincent Mariani as chief merchandising officer, Peter Leap as chief operating officer, and Venky Govind as chief information officer.

13.     Prior to the acquisition of Debtors by CLP, NBTY provided a wide range of services to Debtors, including human resources, finance, accounting, information technology, warehousing and distribution, e-commerce services, call center services, product data management services, procurement and regulatory compliance, among others (collectively, the "**Legacy Services**").  Debtors also relied on NBTY for the supply of the majority of their product.

14.     Debtors' business plan following their acquisition by CLP acquisition was to separate from their dependence on NBTY for the Services and product.

15.     To assist in this transition, NBTY and Retail entered into a transition services agreement, supply agreement and a lease agreement.

5

16.     Retail and NBTY entered into the Transition Services Agreement, dated as of February 16, 2016 and amended by that certain Amendment No. 1 dated as of April 17, 2017 (collectively, the "**TSA**") whereby NBTY agreed, among other things, to provide a variety of services similar to the Legacy Services to Debtors for various time periods post-acquisition. As a carve-out transaction, Debtors were dependent on the provision of services by NBTY for a transitional period until they could acquire the ability to perform these functions directly or outsource these functions to other services providers. NBTY continues to provide services under the TSA as of the Petition Date.

17.     Retail and NBTY entered into the Supply Agreement, dated as of February 16, 2016 and as amended on August 10, 2016 (collectively, the "**Supply Agreement**") for NBTY to supply product to Debtors during the post acquisition time period. As of the Petition Date, the Supply Agreement remains in place.

18.     Retail, as manager, and NBTY, as owner, entered into the Management Agreement, dated as of February 16, 2016 (the "**Management Agreement**"). The Management Agreement is a slightly-misnamed agreement that provides for Debtors' ability to use and operate a retail location located in Bohemia, New York (the "**Bohemia Store**"). The Bohemia Store is owned by NBTY. Pursuant to the Management Agreement, Retail manages and operates the Bohemia Store. Retail retains all revenues and receipts accruing from the operation of the Bohemia Store as a management fee.

19.     Debtors have made great strides toward completion of the transition from NBTY. They have transitioned the Legacy Services from NBTY and are prepared to reject the TSA as of October 31, 2017.

667680.1 09/11/2017

20.     Debtors are in the process of transferring their distribution services from NBTY to other third party providers. In connection therewith, Debtors are winding down their operations at the Nevada and New York distribution centers, which were legacy NBTY operations. Debtors' new distribution centers in California and Ohio are entirely separate from NBTY and Debtors intend to solely operate out of these centers by the November 2017.

21.     Debtors have also either identified or qualified third party manufacturers to supply all of their private label product needs and replace Debtors need for product from NBTY. Debtors anticipate transition to these new manufacturers by December 2017.

22.     However, during this transition period, Debtors experienced significant supply chain and ingredient availability issues, which contributed to Debtors' reduced liquidity. Debtors suffered significant lost sales a result of the deficient ingredient supply. Debtors were also hurt by the struggling retail market, above market rents and underperforming retail stores.

23.     In February 2016, Debtors retained Retail Consulting Services d/b/a RCS Real Estate Advisors ("**RCS**") to provide retail advisory services, including reviewing Debtors' leases, identifying above market rents, and assisting Debtors with negotiating new terms of leases for underperforming retail stores. Debtors subsequently closed 45 underperforming stores. This effort resulted in over $2 million in EBITDA savings.

24.     Debtors have also identified at least 51 additional stores that they intend to close during these Chapter 11 Cases. On September 8, Debtors began the process of selling down the inventory located at these stores and intend to reject such leases as of September 30, 2017.

25.     Debtors are further evaluating the leases for additional underperforming locations and will attempt to renegotiate the rent thereunder. If those negotiations are unsuccessful, Debtors will be forced to reject those leases as well.

667680.1 09/11/2017

26.     In August 2017, Debtors hired RAS Management Advisors, LLC ("**RAS**") to assist them with: (a) reviewing Debtors' 13-week cash flow forecasts, including the extended cash flow forecast, and all underlying operational assumptions, so as to evaluate the reasonableness of the Debtors' cash flow forecast and related assumptions; (b) reviewing the Debtors' plans related to potential store closures and related inventory sales and liquidation plans to assess the reasonableness of such plans and implications on the Debtors' cash flow projections; and (c) reviewing the Debtors' plans related to other potential restructuring initiatives.

27.     Debtors have further retained RAS to assist them during these Chapter 11 Cases to: (a) work with Debtors' Chief Financial Officer ("CFO") in the management of all aspects of the Company's financial resources, including cash management, the evaluation of the Company's near-term cash and liquidity requirements, (b) oversee of the development of Debtors' financial projections and related reporting (including Debtors' compliance with reporting required by the US Trustee as part of the bankruptcy filing), and (iii) assist in the development of information that may be required in support of any plan of reorganization.

28.     Debtors filed these Chapter 11 Cases to pursue a restructuring of their balance sheets and operations and to address the above market rents and underperforming retail stores.

C.     **Key Liabilities**

29.     As of the Petition Date, Debtors owe approximately $14.4 million in principal plus accrued interest on the Secured Prepetition Debt (defined below) and a total of approximately $9.5 million on the Seller Note, which is subordinated to the Secured Prepetition Debt.

### (i)    Secured Prepetition Debt

30.    Prior to the commencement of the Chapter 11 Cases, Retail was party to (A) that certain Credit Agreement dated as of February 16, 2016, as amended, modified or supplemented (the "**Prepetition Credit Agreement**"), by and between Retail, as borrower, and Wells Fargo Bank, National Association, as agent ("**Prepetition Agent**") and lender, and the other lenders thereto, ("**Prepetition Lenders**"), whereby Prepetition Lenders made certain loans and financial accommodations (collectively, the "**Prepetition Loans**") to Retail to, *inter alia*, fund Debtors' business operations and (B) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Prepetition Agent and/or Prepetition Lenders, including, without limitation, control agreements, mortgages, security agreements, guaranties, and UCC financing statements and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (as amended, modified or supplemented and in effect, collectively, the "**Prepetition Financing Documents**").

31.    As of the close of business on September 8, 2017, Retail was liable to Prepetition Lenders under the Prepetition Financing Documents, on account of "Committed Loans" in the approximate aggregate principal amount of $14,421,828.04 million, *plus* interest accrued and accruing at the default rate, costs, expenses, fees (including attorneys' fees and legal expenses), Credit Party Expenses, other charges and other obligations, including, without limitation, on account of cash management, credit card, depository, investment, leasing, hedging and other banking or financial services secured by the Prepetition Financing Documents (collectively the "**Prepetition Debt**").

32.     Debtors Interholdings, Online, Vitamin Depot, Precision, VW Guam, VW Virgin Islands, and Nutrition Warehouse (collectively, "**Guarantors**") unconditionally guaranteed repayment of the Prepetition Debt to the Prepetition Lender under the Prepetition Credit Agreement pursuant to that certain Guaranty dated as of February 16, 2016 made by the Guarantors in favor of Prepetition Lender.

33.     To secure the Prepetition Debt, Retail and Guarantors granted continuing security interests and liens to the Prepetition Agent and the Prepetition Lenders upon substantially all of their property, including, without limitation, the following, all as defined in the Prepetition Financing Documents (collectively, the "**Prepetition Collateral**")[3]: (i) all Accounts; (ii) all Goods, including Equipment, Inventory and Fixtures; (iii) all Documents (including, if applicable, electronic Documents), Instruments and Chattel Paper (whether tangible or electronic); (iv) all Letters of Credit and Letter-of-Credit Rights; (v) all Securities Collateral; (vi) all Investment Property; (vii) all Intellectual Property Collateral; (viii) all Commercial Tort Claims, including, without limitation, those described in Section IV of the Information Certificate; (ix) all General Intangibles; (x) all Deposit Accounts and Securities Accounts; (xi) all Supporting Obligations; (xii) all books and records relating to the Collateral; and (xiii) to the extent not covered by clauses (i) through (xii) of this sentence, all other personal property of such grantor, whether tangible or intangible and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such grantor from time to time with respect to any of the foregoing.

---

[3]     Each term as used in this sentence has the meaning ascribed thereto in the applicable Prepetition Financing Documents. Notwithstanding anything to the contrary contained in clauses (i) through (xiii), the security interest created by the applicable Prepetition Financing Documents does not extend to, and the term "Prepetition Collateral" shall not include, any "Excluded Property".

34.     Despite the impact on Debtors from supply chain disruptions, above market rent, and underperforming brick and mortar stores, Debtors remained in payment compliance under the Prepetition Financing Documents.

35.     Prepetition Lenders have not exercised their rights and remedies under the Prepetition Financing Documents as of the Petition Date.  Instead, Prepetition Lenders have supported Debtors through this time and agreed to Debtors use of cash collateral and entry into the DIP Credit Facility described below.

**(ii)     Subordinated Debt.**

36.     In connection with the acquisition in 2016 from NBTY, RE Holdings issued the Seller Note to NBTY.  The Seller Note is unsecured and bears interest at 7%.  Interest payments are due quarterly under the Seller Note.  The Seller Note requires payment of principal quarterly in $750,000 installments commencing on March 31, 2018.  The Seller Note matures on February 16, 2021.

37.     As of the Petition Date, approximately $9.5 million was outstanding under the Seller Note (the "**Subordinated Debt**").

38.     The NBTY Seller Note is subordinate to the Prepetition Debt following an event of default under the Prepetition Financing Documents unless Debtors meet certain availability thresholds based upon financial forecasts acceptable to Prepetition Lenders.

39.     RE Holdings is current in its payments on the Subordinated Debt as of the Petition Date.

11

### (iii)    Trade Debt.

40.    In the ordinary course of business, Debtors source, order and purchase inventory from their preferred suppliers on credit based on standard industry terms. As of the Petition Date, Debtors owe approximately $19.7 million in trade debt.

## D.    Key Assets

### (ii)    Leased Property

41.    Debtors lease 334 locations and the New York and Nevada distribution centers. As detailed above, prior to the Petition Date, Debtors commenced efforts to reduce their brick and mortar footprint to eliminate unprofitable locations by commencing sales at such locations. Debtors further plan to reject the lease agreements related to unprofitable locations during these Chapter 11 Cases.

### (iii)    Inventory

42.    Debtors maintain a significant amount of inventory. As of September 3, 2017, Debtors held inventory with an approximate value of approximately $30 million.

### (iv)    Intellectual Property

43.    Debtors own numerous trademarks related to the Vitamin World brand that provide Debtors a competitive edge in the market.

## PART II

44.    Concurrently with the filing of these Chapter 11 Cases, Debtors have filed a number of First Day Motions, consisting of procedural motions and motions relating to Debtors' business operations. Debtors submit that approval of each First Day Motion is an important element of its reorganization efforts and is necessary to ensure a smooth transition into chapter 11 with minimal disruption to their operations. I have reviewed each of the First Day Motions, including the exhibits thereto, and believe that the relief requested therein is critical to Debtors'

12

ability to achieve a successful reorganization.  Factual information with respect to each First Day

Motion is provided below and in each First Day Motion.[4]

**A.    Procedural Motions**

**(1)    MOTION OF DEBTORS FOR ENTRY OF ORDER DIRECTING JOINT ADMINISTRATION OF CHAPTER 11 CASES PURSUANT TO BANKRUPTCY RULE 1015(b)**

45.    Debtors in these Chapter 11 Cases are affiliated entities.  Debtor RE Holdings

owns or controls, either directly or indirectly, 100% of the outstanding voting securities of each

of Debtors.  The vast majority of the Debtors' business operations are conducted through Retail.

46.    The joint administration of these Chapter 11 Cases will promote economical and

efficient administration of Debtors' estates.   Debtors anticipate that numerous motions,

applications, notices, and orders will relate to several of Debtors' cases.  Joint administration of

these Chapter 11 Cases will permit use of a single general docket for all of Debtors' cases and

avoid duplicative filings by the Court, Debtors, and parties in interest.  Thus, Debtors believe

joint administration of Debtors' estates will reduce costs and minimize the potential for

confusion, which is in the best interests of Debtors' estates, their creditors and all other parties in

interest.

**(2)    MOTION OF THE DEBTORS FOR AN ORDER AUTHORIZING DEBTORS TO (I) FILE A CONSOLIDATED LIST OF CREDITORS, (II) FILE A CONSOLIDATED LIST OF DEBTORS' THIRTY CREDITORS HOLDING LARGEST UNSECURED CLAIMS AND (III) MAIL INITIAL NOTICES**

47.    The Debtors currently keep and update various lists of the names and addresses of

each of their respective creditors that will be entitled to receive certain notices and other

pleadings filed in the Chapter 11 Cases.  The Debtors believe that the information contained in

---

[4]    All defined terms used in this Part II of this Declaration, but not otherwise defined, shall have the same meaning as set forth in the applicable first day motion referred to unless otherwise so stated.

these computer files can be consolidated and used in an efficient manner to provide notices in these Chapter 11 Cases.

48.     Due to the number of creditors in these cases, Debtors submit that a single consolidated list of their combined thirty (30) largest unsecured creditors, excluding insiders, in these Chapter 11 Cases would be more reflective of the body of unsecured creditors that have the greatest stake in these cases than separate lists for each Debtor.  Indeed, a list of the combined top 30 creditors captures creditors with claims as low as $58,352.58.  Any marginal benefit to preparing individual creditor lists for each Debtor is far outweighed by its burden and expense.

49.     Allowing the Debtors or JND to effect service of the Debtors' own mailings will save significant cost, time and expense.

**B.     Motions Relating to Business Operations**

**(1)     DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (B) USE CASH COLLATERAL, AND (C) ENTER INTO DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION LENDERS, (III) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS TO POSTPETITION LENDERS; (IV) MODIFYING THE AUTOMATIC STAY; (V) SCHEDULING A FINAL HEARING AND (VI) GRANTING RELATED RELIEF (the "DIP Motion")**

50.     Pursuant to the Prepetition Credit Documents, Prepetition Lenders were granted security interests in and continuing liens on substantially all Prepetition Collateral.

51.     All of Debtors' cash, including, without limitation, all cash and other amounts on deposit or maintained in Debtors' primary deposit account and any amounts generated by collection of Debtors' accounts receivable, the sale of the Debtors' inventory, or any other disposition of the Prepetition Collateral constitutes proceeds of the Prepetition Collateral and Cash Collateral in which Prepetition Lenders have an interest.

52.     Beginning in August 2017, Debtors, along with the assistance of their financial advisor, RAS Management, assessed their financing needs.  Since that time, Debtors contacted various financial institutions to request financing.

53.     The working capital facility of the type and magnitude needed in these cases could not have been obtained on an unsecured basis.  Potential sources of debtor-in-possession financing for Debtors, obtainable on an expedited basis and on reasonable terms, were practically nonexistent.

54.     Because substantially all of Debtors' assets are pledged to the Prepetition Lenders, Debtors' attempts to obtain unsecured credit or credit secured by a junior lien on their assets, were unavailing.  Because of Debtors' need for the liquidity, Debtors have concluded that, in their business judgment, Prepetition Lenders, who are already intimately familiar with Debtors' business operations, corporate structure, financing arrangements and collateral base, are the only lenders able to offer a post-petition credit facility to meet Debtors' working capital needs on the terms, and within the time frame, that Debtors require.

55.     Prepetition Lenders have indicated a willingness to provide Debtors with certain financing commitments but solely on the terms and conditions set forth in the Interim Order, Final Order and the DIP Financing Documents.  After considering all of their alternatives, Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by Prepetition Lenders represents the best post-petition financing presently available to Debtors.

56.     The delays, cost and expense of placing this loan with a new lender, assuming one could be found, would be detrimental to the estates and ultimately diminish creditor recoveries.

57.     In connection with Debtors' determination that their best financing was through the DIP Facility, Debtors negotiated, at arms'-length and in good faith, the DIP Credit Agreement and the DIP Financing Documents.

58.     Without the liquidity provided by the DIP Facility, Debtors would be unable to pay suppliers, landlords, employees and other constituencies that are essential to the orderly operation of the business and the retention of the value of their assets.

59.     Access to substantial credit is necessary to meet the substantial day-to-day costs associated with Debtors' operations. Access to sufficient cash is therefore critical to Debtors. In the absence of immediate access to cash and credit, Debtors' suppliers will refuse to sell critical supplies and services to Debtors, and Debtors will be unable to operate their business or maximize recoveries on their assets.

60.     For these reasons, access to credit under the DIP Facility and the financial accommodations as provided thereby are critical to promote: (a) Debtors' continued operations during these cases; (b) the maintenance of the value of Debtors' assets; and (c) Debtors' ability to effectively to maximize the value of their assets.

61.     Debtors submit that the proposed terms of the DIP Financing are fair, reasonable and adequate in that these terms neither tilt the conduct of these cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor prevent motions by parties in interest from being decided on their merits.

62.     I do not believe Debtors could have obtained any viable DIP financing under the circumstances of the type and magnitude required on a more favorable economic basis than the economic terms of the DIP Facility taking into account the circumstances, financial condition and financial forecast for Debtors.

667680.1 09/11/2017

63.     I believe the DIP Facility is a vital component in preserving the value of Debtors' business and, as such, is in the best interests of Debtors' estates and creditors.

**(1)     MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING (A) CONTINUATION OF EXISTING CASH MANAGEMENT SYSTEM, (B) MAINTENANCE OF EXISTING BUSINESS FORMS AND BANK ACCOUNTS, (C) CONTINUATION OF INTERCOMPANY TRANSACTIONS, AND (D) PAYMENT OF RELATED PREPETITION OBLIGATIONS PURSUANT TO SECTIONS 105(A), 363(B), AND 363(C) OF BANKRUPTCY CODE AND BANKRUPTCY RULES 6003 AND 6004 AND (II) WAIVING REQUIREMENTS OF SECTION 345(B) OF BANKRUPTCY CODE**

64.     Before the Petition Date, Debtors employed a cash management system to collect funds generated by its operations and to disburse funds to satisfy obligations incurred in the ordinary course of their business (the "**Cash Management System**").

65.     The Cash Management System is comprised of various collections and disbursement accounts, as well as separate accounts for each retail store location. The Bank Accounts are described in further detail below.

66.     The Cash Management System consists of a total of 354 bank accounts (the "**Bank Accounts**"). The majority of the Bank Accounts are held at Wells Fargo Bank, National Association ("**Wells Fargo**"), which is Debtors' primary cash management provider and the administrative agent on Debtors' prepetition asset-based revolving credit facility (the "**ABL Facility**"). A list of Debtors' Bank Accounts is attached as **Exhibit C** to the Motion Of Debtors For Interim And Final Orders (I) Authorizing (A) Continuation Of Existing Cash Management System, (B) Maintenance Of Existing Business Forms And Bank Accounts, (C) Continuation Of Intercompany Transactions, and (D) Payment Of Related Prepetition Obligations Pursuant to Sections 105(A), 363(B), and 363(C) of Bankruptcy Code and Bankruptcy Rules 6003 and 6004 and (II) Waiving Requirements of Section 345(B) of Bankruptcy Code (the "**Cash Management Motion**").

67.     The majority of the Bank Accounts are held at Wells Fargo, which designated as an authorized depository by the U.S. Trustee.  Approximately 38 Bank Accounts, which collect cash from purchases made by customers in individual retail store locations, are not held at depositories authorized by the UST Operating Guidelines.  These Bank Accounts were opened in locations in which Wells Fargo's services were not available.  However, only small amounts of cash flow through these Bank Accounts, all cash held in each of these Bank Accounts is swept into the Master Operating Account held by Wells Fargo each day.  These Bank Accounts are also always below the FDIC's $250,000 limit.  Debtors request authority to keep these accounts open, as closing these Bank Accounts would result in a severe disruption of the Debtors' businesses, especially individual retail store locations, and would place a heavy administrative burden on Debtors' estates.

68.     All of Debtors' Bank Accounts are held in the name of Vitamin World, Inc. or Vitamin World Online, Inc.

69.     Master Operating Account: Debtors borrow funds daily from Wells Fargo based upon the ABL Facility as needed to cover anticipated expenditures.  Amounts borrowed each day vary based upon Debtors' need to fund certain disbursements.  The requested funds are deposited in a master operating account with Wells Fargo Bank (Account No. ending in 7952) (the **"Master Operating Account"**).

70.     Disbursement Accounts: Debtors maintain various disbursement accounts, which are funded by the Master Operating Account.  Funds from the Master Operating Account are transferred into Debtors' payroll account (the **"Payroll Account"**) (Account No. ending in 0714), to fund Debtors' payment of employee wages, employee benefit plans, and other employee expenses, or into one of Debtors' four controlled disbursement accounts, the **"Refunds**

Account," the "**Expense Accounts**," or the "**Utilities Account**."   The Refunds Account (Account No. ending in 5429) holds only a small amount of money at any given time and provides funds for Debtors' online customers who use checks to pay for purchases.  The Expense Accounts (Account No. ending in 0714 for Vitamin World, Inc. and 0740 for Vitamin World Online, Inc.) fund the payment of all of Debtors' retail stores' expenses, including any invoices received by the retail stores, and any expenses, such as advertising, for Debtors' websites. Finally, Debtors' Utilities Account (Account No. ending in 7803) is maintained by Wells Fargo Bank for the sole purpose of funding Debtors' utility payments.  Funds are automatically debited from the Utilities Account through the Automated Clearing House.

71.    <u>Collections</u>. Debtors maintain individual deposit accounts at each of their 334 individual retail store locations with various banks, into which cash collected in Debtors' individual retail store locations are deposited (collectively, the "**Retail Accounts**").   The majority of the Retail Accounts are maintained by Wells Fargo, but in certain locations where Wells Fargo's services are unavailable, the Retail Accounts are maintained by other banks. Debtors also maintain two Merchants Credit Retail Accounts (the "**Merchants Credit Accounts**") (Account No. ending in 7761 for Vitamin World, Inc. and 7779 for Vitamin World Online, Inc.), which hold funds transferred by credit card companies when Debtors' in-store and online customers pay for purchases using personal credit cards.

72.    Cash deposited into the Wells Fargo Retail Accounts and the Merchants Credit Accounts is swept daily each into a master depository account (the "**Master Depository Account**") (Account No. ending in 8988), which automatically pays down the revolving line of credit under the ABL Facility.  Funds deposited into Retail Accounts not maintained by Wells Fargo are swept daily into either (i) a M&T Master Account, (ii) a Chase Master Account, or

(iii) a Banco Popular Master Account. Funds in these accounts are then swept into the Master Depository Account, and are likewise used to pay down the ABL Facility.

73.     Debtors Vitamin World, Inc. and VW Online, Inc. are parties to a Commercial Card Agreement with Wells Fargo, pursuant to which Wells Fargo provides company credit cards (the "**Credit Cards**") for distribution to certain of Debtors' Employees. Debtors distribute the Credit Cards to approximately 38 of their Employees to pay for travel reimbursements and other expenses incurred by their Employees in the ordinary course of business. Each of these Employees holds multiple Credit Cards, which are used on a per-store basis. Currently, there are approximately 370 issued Credit Cards. No fees are associated with the Credit Cards, which have an aggregate $40,000 credit limit. Wells Fargo automatically deducts the balance due on the Credit Cards each month from Debtors' available borrowing under the ABL Facility.

74.     The scope of Debtors' intercompany transactions (the "**Intercompany Transactions**") is limited to sweeping credit card receipts from the Merchants Credits Account into the Master Depository Account, which automatically pays down the revolving line of credit under the ABL Facility. The Intercompany Transactions are routine and necessary for the payment of ordinary course expenses.

75.     Debtors maintain records of transfers of cash and can trace and account for all such Intercompany Transactions. Debtors will continue to maintain such records. If the Intercompany Transactions were terminated, the Cash Management System would be disrupted to the detriment of Debtors and their estates.

76.     Debtors incur approximately $75,000.00 per month in various fees in connection with their Bank Accounts, including bank fees, unused line of credit fees, letter of credit fees, and other miscellaneous fees (the "**Bank Fees**") (See **Exhibit D** for an example of monthly Bank

Fees).  These fees are automatically deducted each month by Wells Fargo on the 11th of each month, and therefore Bank Fees will be due on the Petition Date.

77.    In the ordinary course of business, Debtors use a variety of correspondence and business forms, including purchase orders and checks (collectively, the "**Business Forms**").  To minimize the expense to Debtors' estates associated with developing or purchasing entirely new forms, the delay in conducting business before obtaining such forms, and the confusion of suppliers and other vendors, Debtors seek authority to continue using their Business Forms substantially in the forms used immediately before the Petition Date, without reference therein to Debtors' status as "Debtors-in-Possession."

78.    The Cash Management System constitutes an ordinary-course and essential business practice providing significant benefits to Debtors, including the ability to control corporate funds, ensure the maximum availability of funds when and where necessary, the reduction of borrowing costs and administrative expenses by facilitating the movement of funds, and the availability of timely and accurate account balance information consistent with prepetition practices.  The use of the Cash Management System has historically reduced Debtors' expenses by enabling Debtors to use funds in an optimal and efficient manner.  Accordingly, the continued use of the Cash Management System without interruption is vital to Debtors' business operations and the success of these Chapter 11 Cases.

79.    Payment of the prepetition Bank Fees is in the best interests of Debtors, their estates, and all parties in interest as it will prevent any disruption to the Cash Management System.

80.    Because of their routine nature, the Intercompany Transactions are integral to Debtors' ability to operate their businesses and successfully emerge from Chapter 11.

21

81.    In these Chapter 11 Cases, strict enforcement of the UST Operating Guidelines with respect to the Cash Management System would severely disrupt Debtors' ordinary financial operations by reducing efficiencies, increasing administrative burdens, and creating unnecessary expenses. For example, if Debtors were required to open new debtor-in-possession accounts and modify the Cash Management System accordingly, Debtors would be forced to reconstruct the Cash Management System in its entirety. This simply would not be possible in an enterprise like Debtors, which requires multiple bank accounts. Debtors' treasury department, including accounting and bookkeeping employees, would need to focus their efforts on immediately opening new bank accounts and working to establish controls for cash to flow properly, thereby diverting it from their daily responsibilities during this critical juncture of Debtors' Chapter 11 cases. Many accounts could not be replaced in time without a significant disruption of Debtors' business operations. Even if they could, the opening of new bank accounts would increase operating costs, and the delays that would result from opening new accounts, revising cash management procedures, and instructing customers to redirect payments would negatively impact Debtors' ability to operate their businesses while establishing these new arrangements.

82.    Debtors issue manual checks from time to time and use a variety of Business Forms in the ordinary course of their business. Strict compliance with the UST Operating Guidelines and Local Rule 2015-2(a) would increase Debtors' expenses and would risk unnecessarily confusing Debtors' customers, suppliers, and employees.

83.    The cost associated with satisfying the requirements of section 345(b) of the Bankruptcy Code with respect to the Bank Accounts would be burdensome to Debtors and their estates; and the process of satisfying such requirements would lead to needless inefficiencies in the management of Debtors' business.

667680.1 09/11/2017

84.    Debtors intend to be in chapter 11 only a short period of time, and the costs of disruption to the businesses by having to close dozens of accounts far outweighs the risks of Debtors continuing to maintain their historic Bank Accounts for the short period of time they remain in chapter 11.

(2)    **MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING PAYMENT OF CERTAIN PREPETITION TAXES AND ASSESSMENTS AND (II) DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS PURSUANT TO SECTIONS 105(a), 363(b), 507(a), AND 541 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6003 AND 6004**

85.    In connection with the normal operation of their businesses, Debtors collect, withhold and/or incur an assortment of taxes and assessments that they remit periodically to various Taxing Authorities.

86.    The taxes and assessments to which Debtors are typically subject generally fall into the following categories: sales taxes, franchise taxes, personal property taxes, income taxes, and in some instances, local city ordinary taxes (each herein defined and collectively, the "**Taxes**"). Debtors pay the Taxes monthly, quarterly or annually, in each case as required by applicable laws and regulations. During the last calendar year, Debtors paid a total of approximately $6,780,293.00 in Taxes.

87.    The vast majority of Debtors' tax liability stems from sales tax, which Debtors are required in certain states to collect and/or pay (the "**Sales Taxes**") from purchasers of their products and/or services and on account of products used by Debtors. Debtors collect the Sales Taxes on a per sale basis and periodically remit the Sales Taxes to the applicable Taxing Authorities. The process by which Debtors remit the Sales Taxes varies, depending on the Taxing Authority to be paid. Sales Taxes are remitted to the relevant Taxing Authorities either on the basis of estimated Sales Tax collections for the coming period or on the basis of Sales

23

Taxes actually collected from customers during the prior period.  With respect to those jurisdictions that require Debtors to remit estimated Sales Taxes, Debtors subsequently reconcile payments to determine any payment deficiency or surplus for the period and any necessary additional payment is then made or refund requested.  Similarly, states differ with regard to the frequency of payments.  Sales Taxes are paid on a monthly or quarterly basis, depending on the state.  If Debtors do not pay the Sales Taxes in accordance with their obligations, then Debtors will become liable for further amounts in the form of penalties.

88.    Debtors estimate that approximately $211,857.30 in Taxes relating to the prepetition period will become due as of the Petition Date and additional Taxes in the amount of $240,000 will become due within the first 30 days following the Petition Date. Debtors request authority to pay these Taxes on an interim basis.

89.    The amounts of the Taxes listed above are good faith estimates based on Debtors' books and records and remain subject to potential and ongoing audits and other adjustments.  As such, Debtors also seek authorization to pay any prepetition Taxes due and owing following audit and review.

90.    Debtors seek authority to pay the pre-petition Taxes to, among other things, discourage the Taxing Authorities from taking actions that may interfere with Debtors' continued business operations.  Nonpayment of these obligations may cause Taxing Authorities to take precipitous action, including, but not limited to, asserting liens, seeking to lift the automatic stay or revoking or suspending necessary licenses, which would disrupt Debtors' day-to-day operations and could potentially impose significant costs on Debtors' estates.  Failure to satisfy the prepetition Taxes may jeopardize Debtors' maintenance of good standing to operate in the jurisdictions in which they do business.

91.     Some of the prepetition Taxes, such as the Sales Taxes may constitute "trust fund" taxes, which Debtors are required to collect and hold in trust for payment to the Taxing Authorities.

92.     Debtors file many tax returns each year with the federal government and the states in which they have a tax nexus, plus Guam, Puerto Rico, and the U.S. Virgin Islands. The failure to remit prepetition Taxes, such as Sales Taxes, and certain other Taxes, significantly increases Debtors' officers' and directors' exposure to possible personal liability during the pendency of these Chapter 11 Cases. The threat of a lawsuit or criminal prosecution, and any ensuing liability, would distract Debtors and their officers and directors from important tasks during a critical time. This would be detrimental to parties in interest because the dedicated and active participation of Debtors' officers and directors is integral to Debtors' continued operations and essential to the orderly administration of these Chapter 11 Cases. Debtors' estates are best served by eliminating the possibility of these distractions at the outset of these Chapter 11 Cases. Accordingly, because the proposed relief is in the best interests of Debtors' estates, Debtors request authority to pay the prepetition Taxes.

(3)     **MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) APPROVING PROPOSED FORM OF ADEQUATE ASSURANCE OF PAYMENT TO UTILITY COMPANIES, (II) ESTABLISHING PROCEDURES FOR RESOLVING OBJECTIONS BY UTILITY COMPANIES, AND (III) PROHIBITING UTILITY COMPANIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE PURSUANT TO SECTIONS 105(a) AND 366 OF THE BANKRUPTCY CODE**

93.     To operate their businesses and manage their properties, Debtors obtain telecommunications, waste disposal, water, gas, electricity, and other utility services (collectively, the "**Utility Services**") from a number of utility companies (collectively, the "**Utility Companies**"). A nonexclusive list of Utility Companies that provide Utility Services to Debtors as of the Petition Date is provided on **Exhibit 1** annexed to both the Interim Order and

25

Final Order (the "**Utility Services List**") attached to the Motion Of Debtors For Interim and Final Orders (I) Approving Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures For Resolving Objections By Utility Companies, and (III) Prohibiting Utility Companies From Altering, Refusing, Or Discontinuing Service Pursuant to Sections 105(A) and 366 of the Bankruptcy Code .[5]

94.    Historically, Debtors have a good payment record with the Utility Companies. To the best of Debtors' knowledge, there are no defaults or arrearages of any significance for Debtors' undisputed invoices for prepetition Utility Services, other than payment interruptions that may be caused by the commencement of these Chapter 11 Cases. Based on their monthly average for the twelve (12) months before the Petition Date, Debtors estimate that their cost of Utility Services for the next thirty (30) days will be approximately $149,196.39.

95.    Uninterrupted Utility Services are essential to Debtors' ongoing operations and, therefore, the success of Debtors' reorganization. Without natural gas, water, electricity, internet access, telecommunications and other standard utility services, Debtors would be unable to operate their various operating properties, retail locations, and headquarters. Should any Utility Company alter, refuse, or discontinue service, even briefly, Debtors' business operations could be severely disrupted. Debtors coordinate their businesses and retail operations through their headquarters in Holbrook, New York and their 334 retail locations across the United States and its territories. Interruption of the Utility Services provided at these locations would disrupt Debtors' ability to communicate with and provide services to, their employees, vendors,

---

[5]    The inclusion of any entity in, or omission of any entity from, the Utility Services List is not an admission by Debtors that such entity is, or is not, a utility within the meaning of section 366 of the Bankruptcy Code, and Debtors reserve all rights and defenses with respect thereto.

customers, and various regulatory authorities.  Such interruption would negatively impact Debtors' reorganization efforts and all parties in interest.

96.     Debtors intend to pay all post-petition obligations owed to the Utility Companies in a timely manner and have sufficient funds to do so.

97.     Debtors estimate that the total amount of the Adequate Assurance Deposit will be approximately $68,859.87.  The Adequate Assurance Deposit will be held by Debtors in the Utility Deposit Account for the benefit of the Utility Companies on the Utility Services List during the pendency of these Chapter 11 Cases.

**(4)     DEBTORS' MOTION FOR THE ENTRY OF AN ORDER (I) AUTHORIZING PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS AND RELATED WITHHOLDING TAXES; (II) AUTHORIZING THE PREPETITION EMPLOYEE BENEFITS AND CONTINUATION OF THE EMPLOYEE BENEFIT PLANS; AND (III) DIRECTING ALL BANKS TO HONOR PREPETITION CHECKS FOR PAYMENT OF PREPETITION EMPLOYEE OBLIGATIONS**

98.     Debtors employ a total of approximately 1,478 active employees ("**Employees**") in their 334 retail locations, support center, and management offices. The majority of Debtors' Employees are employed on a part-time basis, while approximately 400 of Debtors' employees are full-time.  Approximately 16 Employees are currently on a leave of absence.

99.     To minimize Employees' personal hardships, and to enhance Debtors' ability to retain such Employees during these Chapter 11 Cases, Debtors seek authority to pay certain prepetition claims arising on account of Employees for, among other items, wages (including but not limited to salaries, accrued bonuses, commissions and other compensation), vacation, sick leave, paid time off and other paid leave, federal and state withholding taxes, payroll taxes, contributions to employee benefit plans, health claims, the Reimbursable Expenses (as defined below), and all other employee benefits that Debtors pay in the ordinary course of business (collectively, the "**Employee Obligations**"), including, as defined below, the Unpaid

Compensation, the Employee Deductions, the Employee Benefits, the Health Benefits, the Employee Insurance Benefits, the Other Insurance Benefits, and the Other Non-Insurance benefits (collectively, with the Employee Obligations, the "**Employee Payments**").

100.    In the ordinary course of business, Debtors issue payroll checks to its salaried and hourly Employees. Debtors' payroll is administered by ADP, and Debtors are current on all amounts owed to ADP. The majority of Debtors' Employees are paid on an hourly basis while a few are paid salaries. All of Debtors' Employees are paid on a bi-weekly basis. Disbursements from Debtors' payroll are made two weeks in arrears, including earnings through the end of the previous pay period. The estimated gross payroll for Debtors' salaried employees is approximately $1,893,666.67 per month. Debtors' hourly Employees are paid a standard rate per hour, which varies each pay period. The total estimated gross payroll for all of Debtors' hourly and salaried Employees is approximately $3,134,421.33 per month.

101.    In addition, Debtors pay monthly discretionary commissions to certain Employees based upon sales that individual Employees process in the Debtors' retail store locations. Any given commission amount is based upon the price of a particular product purchased by a customer, as well as the brand of the product. Retail associates receive such commissions as part of their regular paychecks, while store managers receive commissions monthly, in or around the third week following the month in which the commission was earned. Such commissions are effectively a portion of such Employee's salary and are vital to such Employee. Historically, Debtors have paid approximately $397,000 per month in Commissions.

102.    Prior to the Petition Date, Debtors accrued vacation and PTO obligations, and may have accrued severance, sick and other paid leave obligations. Debtors intend to only pay

28

pre-petition accrued severance, sick and other paid leave obligations in the ordinary course of business.

103.    Debtors must pay certain payroll taxes including FICA, FUTA, SUTA and withholdings taxes, as required by federal, state and/or local authorities.

104.    Debtors believe that approximately $901,860.76 in wages, salaries, commissions, overtime pay, accrued bonuses and other compensation (excluding accrued vacation and severance pay) accrued prior to the Petition Date and remains unpaid (collectively, the "**Unpaid Compensation**"). The Unpaid Compensation was due and owing on the Petition Date because, among other things:

> a.    the chapter 11 petition was filed during Debtors' regular and customary salary and hourly wage payroll periods and temporary and contract worker invoice periods;

> b.    some payroll checks issued to Employees and checks issued to or for the benefit of other Employees prior to the Petition Date may not have been presented for payment or cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date; and

> c.    Employees have not yet been paid all their salaries and wages for services performed prior to the Petition Date on behalf of Debtors because payroll checks are issued in arrears or because commissions earned in the ordinary course have not yet been paid.

105.    Debtors offer vacation benefits to their Employees. The vacation benefits vary by Employee. Generally, each calendar year, Employees are entitled to various numbers of days of paid vacation per year depending on the total number of years such Employee has worked for Debtors.

106.    As of the Petition Date, several of Debtors' Employees accrued unused vacation days. The total value of such accrued vacation as of the Petition Date is approximately $354,752.21.

107.    Employees are offered a certain amount of sick days.  As of the Petition Date, several of Debtors' Employees accrued unused sick days. The total value of such accrued sick leave as of the Petition Date is approximately $170,542.23.

108.    Employees are entitled to various numbers of days of paid time off ("**PTO**") per year, depending on the total number of years such Employees have worked for Debtors.  As of the Petition Date, several of Debtors' Employees accrued unused PTO days. The total value of such accrued PTO as of the Petition Date is approximately $890,330.45.

109.    Debtors have established various plans and policies to provide their Employees with medical, dental, vision, and other health benefits (collectively, the "**Health Benefits**"). Regular full-time employees working at least 30 hours a week are eligible to participate in Debtors' health insurance plan, which includes medical, prescription, vision and dental insurance (the "**Health Insurance Plan**").  Hawaii associates, however, are eligible to receive medical and/or dental insurance when working 20 hours or more for a four-week consecutive period.

110.    Debtors pay a substantial portion of the Health Insurance Plan and the balance is paid by Employees through payroll deductions.   The exact percentages paid by Debtors compared to individual Employees depends on the type of coverage selected by each Employee. Certain dependents of eligible Employees may also be eligible for coverage under the Health Insurance Plan. Historically, Debtors have paid approximately $239,189.21 per month (net of employee contributions) in premiums under the Health Insurance Plan.

111.    Aetna administers the medical and dental benefits pursuant to Debtors' Health Insurance Plan in the United States (except Hawaii) and the Virgin Islands.  Employees in the United States and the Virgin Islands pay 31% for medical coverage, and Debtors pay 69%.  For

dental benefits, Employees in the United States and the Virgin Islands contribute 52% of the coverage price, while Debtors contribute 48%.

112.    Medical and dental benefits for Hawaii Employees are administered by HMSA. Employees pay 9% of these benefits and Debtors pay 91%.

113.    Employees in Guam receive medical and dental coverage through Staywell. Employees in Guam contribute 30% and Debtors contribute 70%.

114.    Employees in Puerto Rico receive medical and dental coverage through Triple S. Employees in Puerto Rico contribute 38% of the coverage costs and Debtors contribute 62%.

115.    Vision insurance is provided to all eligible full-time Employees through EyeMed.

116.    Historically, Debtors pay an aggregate amount of approximately $337,561.44 per month for all Health Benefits.

117.    Debtors also provide coverage for eligible Employees under the Federal Consolidated Omnibus Budget Reconciliation Act ("**COBRA**"), which provides certain Employees and their qualified dependents the opportunity to continue under Debtors' Health Insurance Plan where a certain event, such as resignation, termination of employment, or personal leave, would otherwise result in a loss of eligibility under the Health Insurance Plan.

118.    As of the Petition Date, Debtors believe they have accrued but unpaid amounts owing for Health Benefits in the amount of $35,274.88.

119.    Debtors provide Employees with the opportunity to enroll in certain non-health related insurance benefits, including life insurance, AD&D (as defined below), disability insurance, and employee assistance programs (the "**Other Insurance Benefits**").

120.    Life Insurance. Debtors provide a basic life insurance plan through Liberty Mutual to Employees working at least 30 hours per week in the amount of one times such

31

Employee's annual base salary, rounded to the next $1,000 (up to a maximum of $250,000) at no cost to such Employee. Employees may also purchase supplemental life insurance for themselves or their eligible dependents. Debtors pay approximately $1,295.84 per month for the provision of life insurance.

121. <u>Accidental Death and Dismemberment Insurance</u>: Debtors provide basic accidental death and dismemberment insurance ("**AD&D**") through Liberty Mutual to Employees working at least 30 hours per week in the amount of one times such Employee's annual base salary, rounded to the next $1,000 (up to a maximum of $250,000) at no cost to such Employee. This AD&D coverage pays benefits to designated beneficiaries in the event that an Employee experiences an accident resulting in death or serious injury.

122. <u>Disability Insurance</u>: Debtors provide basic short- and long-term disability insurance through Liberty Mutual to Employees working at least 30 hours per week. The basic short disability coverage pays 50% of an Employee's pay check (up to $2,575) for up to 25 weeks. Basic long-term disability insurance covers 50% of an Employee's income up to $10,000 if such Employee continues to be disabled after his or her short-term disability benefits end. Each Employee also has the option to purchase additional coverage in the event that basic disability insurance does not meet such Employee's needs.

123. <u>Employee Assistance Program</u>: Through Liberty Mutual, the Debtors provide full-time eligible Employees a comprehensive program to help Employees resolve personal problems that may adversely impact work performance, health, and wellbeing ("**EAP**"). EAP is provided by Morneau Shepall for Guam Employees.

124. <u>Legal</u>: The Debtors provide voluntary legal coverage through Hyatt Legal Services, which can be purchased by eligible full-time Employees. The program provides

32

Employees and eligible depends access to affordable and convenient legal services from in-network attorneys.

125. <u>Auto/Home/Pet Insurance</u>: Eligible Employees in the US can purchase coverage to insure their homes, cars, and pets at discounted rates that can be deducted from their paychecks through MetLife.

126. Debtors pay approximately $10,733.26 per month for basic life insurance, AD&D, basic disability insurance, and EAP. Historically, Debtors pay an aggregate amount of approximately $348,294.80 for medical, dental, vision benefits, basic life insurance, AD&D, and basic disability insurance each month.

127. Debtors believe that approximately $1,663.50 in Other Insurance Benefits accrued prior to the Petition Date and remains unpaid.

128. Debtors provide Employees with certain other non-insurance benefits listed in the following paragraphs (the "**Other Non-Insurance Benefits**").

129. <u>FSAs and 401(k)s</u>: Debtors provide Employees the opportunity to enroll in a Flexible Spending Account administered by PayFlex, which helps Employees save money by providing a way to pay for certain healthcare expenses with pre-tax income (the "**FSA Plan**"). Depending on the FSA Plan chosen, Employees may contribute up to a maximum of $2,600 to $5,000 to an FSA account each year. Debtors match Employees' contributions to a 401(k), a 401(k) Roth and the FSA Plan (collectively, the "**401(k) Plans**"). For Employees' 401(k) accounts, Debtors match Employee contributions up to an aggregate amount of $262,289 per calendar year. For Employees' 401(k) Roth accounts, Debtors have historically matched Employee contributions up to an aggregate amount of $542,138.40 per calendar year. For Employees' FSA Plan accounts, Debtors have historically matched Employee contributions up to

33

an aggregate of $50,855.92 per calendar year. As of the Petition Date, Debtors' total unremitted 401(k) Plan withholdings were approximately $9,185.39 for the Employer matches and $17,916.55 for the Employee contributions, for an aggregate amount of $27,101.94.

130.   Moving Expenses: Debtors have historically covered the reasonable costs of moving an Employee and his or her family, as well as any household goods, to the Holbrook, New York, area, up to $75,000. Debtors fund up to three house-hunting trips for such employees within the first 12 months of the employment, as well as temporary housing during the first 45 days of employment. Eligible Employees receive $3,500 per month for up to six months following such temporary housing to use for additional temporary living expenses. Eligible Employees have the option of deducting any additional temporary living expenses incurred during said six-month period from the $75,000 relocation allowance. Until June 2017, Debtors covered the cost of one trip home per month for eligible Employees.

131.   Prior to the Petition Date and in the ordinary course of business, Debtors reimburse Employees and officers for certain expenses incurred in the scope of their employment relating to, among other things, business-related travel expenses, business meals, car expenses, mileage reimbursements, and miscellaneous business expenses (collectively, the "**Reimbursable Expenses**"). Historically, Debtors have paid approximately $9,283.19 per month in Reimbursable Expenses.

132.   All of the Reimbursable Expenses were incurred by the Employees on Debtors' behalf and with the understanding that they would be reimbursed. Debtors believe they are current on all reimbursable expenses. However, to avoid harm to Debtors' Employees and officers, Debtors seek to be authorized, but not required, to pay any Reimbursable Expenses in the ordinary course of business.

133.    Debtors have entered into agreements with certain of their executives (each, an "**Executive**"), including Michael Madden, Peter Leap, Julian Van Erlach, Frank Conley, and Vincent Mariani (the "**Employment Agreements**").    The Employment Agreements for all executives except Michael Madden provide for, *inter alia*, (i) six months of severance pay equal to each such Employee's annual base salary following termination of the Executive without cause; (ii) protection against the disclosure of confidential company information by the Executive in the event of termination; and (iii) protection against the solicitation of Debtors' Employees and/or competition by the Executive in the event of termination.

134.    The President and CEO of Debtors, Michael Madden, is also party to an Employment Agreement, setting forth, *inter alia*, his (i) compensation and benefits; (ii) severance entitlements upon termination without cause; (iii) agreement to not disclose confidential company information in the event of termination; and (iv) agreement not to solicit company Employees and/or compete with the company in the event of termination.

135.    Debtors' standard Employment Agreements provide for severance pay for certain Employees who are terminated without cause.    As of September 1, 2017, Debtors' remaining liability for Employees terminated prior to the Petition Date and currently receiving severance pay pursuant to Employment Agreements is $80,003.85.    Debtors seek authority to pay any unpaid yet accrued but not paid severance as of the Petition Date.

136.    Debtors deduct from their Employees' paychecks, among other items: (a) payroll taxes and the Employees' portions of FICA and statutory unemployment taxes; (b) Employee contributions for insurance plans and flexible spending plans; (c) Employee contributions to 401(k) Plans and 401(k) loan repayments; and (d) legally ordered deductions such as wage garnishments, child support, and tax levies (collectively, the "**Employee**

35

**Deductions"**).  Debtors forward the amounts equal to the Employee Deductions from their general operating accounts to appropriate third-party recipients.  These funds were deducted from Employees' paychecks but, due to the commencement of these Chapter 11 Cases, may not have been forwarded to appropriate third-party recipients.

137.    Debtors believe that approximately $901,860.76 in wages, salaries, commissions, overtime pay, accrued bonuses and other compensation (excluding accrued vacation and severance pay) accrued prior to the Petition Date and remains unpaid.  Debtors' books and records indicate that in almost all instances the amount of prepetition wages, salaries, and contractual compensation owing to an Employee will not exceed the sum of $12,850.

138.    It is essential to Debtors that they retain Employees to continue operations pending during the pendency of these Chapter 11 Cases.  Debtors are engaged in a retail business, and their employees are the heart of the business.  In addition, many Employees live from paycheck to paycheck and rely heavily on receiving their full compensation or reimbursement of expenses to continue to pay their daily living expenses.  These Employees will be exposed to significant financial problems if Debtors are not permitted to pay certain of the Employee Obligations and Employee Payments.  Moreover, Debtors believe that if they are not granted the relief requested herein, employee morale and loyalty will be jeopardized at a time when employee support is critical, and likely waning.  Debtors believe such uncertainty will cause significant anxiety at precisely the time that Debtors need their Employees to perform their jobs at peak efficiency.

139.    The Employee Deductions principally represent employee earnings which Employees or, in the case of garnishments, judicial authorities have designated for deduction from employee paychecks and payment accordingly.  The failure to pay these benefits would

36

result in hardship to Employees. Debtors expect inquiries from garnishors regarding Debtors' failure to submit, among other things, child support and alimony payments, which are not Debtors' property but rather have been withheld from employee paychecks. Moreover, if Debtors cannot remit these amounts, its Employees may face legal action due to Debtors' failure to submit these payments.

140.    Debtors' Employees are valuable assets. Deterioration in employee morale and welfare at this critical time undoubtedly would adversely impact Debtors, the value of their assets and businesses, the proposed sale and ultimately, Debtors' ability to maximize value for creditors.

**(6)    MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO (A) CONTINUE INSURANCE PROGRAMS AND (B) PAY ALL OBLIGATIONS WITH RESPECT THERETO; (II) AUTHORIZING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS; AND (III) MODIFYING THE AUTOMATIC STAY WITH RESPECT TO THE WORKERS' COMPENSATION PROGRAM PURSUANT TO SECTIONS 105(a), 362, 363(b), 507(a), AND 541 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 4001, 6003, AND 6004**

141.    In the ordinary course of their businesses, Debtors participate in various insurance programs (each, an "**Insurance Program**") and incur certain obligations to pay premiums and claims (the "**Insurance Obligations**") in accordance with or relating to their respective insurance policies (each, an "**Insurance Policy**") with several insurance carriers (each, an "**Insurance Carrier**"), including: (i) coverage of workers' compensation and employer liability (the "**Workers' Compensation Program**"); (ii) coverage of  general liability (the "**General Liability Insurance Program**"); (iii) coverage of Debtors' automobiles (the "**Automobile Insurance Program**"); (iv) commercial property insurance (the "**Commercial Property Insurance Program**"); (v) coverage of foreign liability (the "**Foreign Liability Insurance Program**"); (vi) coverage for excess liability (the "**Excess Liability Programs**"); (vii) coverage

for ocean cargo liability (the "**Ocean Cargo Insurance Program**"); (viii) coverage for flood liability and loss (the "**NFIP (Flood) Policy**"); (ix) representation and warranty coverage (the "**Reps & Warranties Coverage**"); (x) Private Edge Plus Coverage (the "**Private Edge Plus Program**"); (xi) Excess Edge Coverage (the "**Excess Edge Program**"); and (xii) commercial crime coverage (the "**Commercial Crime Program**").  A complete list of the Insurance Policies is attached as **Exhibit 1** to each of the Proposed Orders for this motion.

142.    Debtors retain the services of Aon, as insurance broker, in connection with maintaining Debtors' Insurance Programs.   Debtors pay Aon a yearly average fee of approximately $156,402 for its services.  The primary Insurance Programs and the role of each insurance broker are discussed in further detail below.  Debtors are also obligated to make payments under their insurance financing agreement with Imperial Premium Finance Services (the "**Insurance Financing Agreement**"), pursuant to which Debtors fund their premium payments for certain Insurance Programs.  A copy of the Insurance Financing Agreement is attached to the motion at **Exhibit C**.  The Insurance Programs are described in further detail below.

143.    <u>Workers' Compensation Program</u>.  Under the laws of the various states and territories in which they operate, Debtors must maintain workers' compensation insurance for their employees for claims arising from or related to employment by Debtors. The Insurance Carrier for the Workers' Compensation Program in the United States is Zurich American Insurance Co. Debtors also have a Workers' Compensation Program in Guam, which is carried by Tokio Marine Pacific Insurance Limited. The Workers' Compensation Program covers, with respect to Debtors' U.S. operations and in accordance with applicable state law, statutory workers' compensation claims and employer liability claims generally arising from lawsuits

38

based on alleged gross negligence or intentional acts brought against Debtors by the survivors of an employee (collectively, the "**Employer Liability Claims**"). Each Workers' Compensation Program was renewed on February 16, 2017 and expires on February 16, 2018. The annual premium on the United States Workers' Compensation Program is approximately $627,390. The annual premium on the Guam Workers' Compensation Program is approximately $5,567. As of the Petition Date, Debtors are current on their premium payments under these policies. As of September 2017, Debtors' aggregate reserve for workers' compensation claims that have been asserted but not yet administered, is approximately $595,734.78.

144.    The General Liability Insurance Program.    Debtors' General Liability Insurance Program consists of a policy with National Fire & Marine Insurance Co. (Berkshire). The coverage period under the General Liability Insurance Program is February 16, 2017 through February 16, 2018. The policy provides between $1,000,000 and $10,000,000 in coverage depending on the occurrence, and the annual premium is approximately $277,265. As of the Petition Date, Debtors are current on their premium payments under this policy.

145.    The Automobile Insurance Program.    Debtors' current auto liability policy carrier is Great Northern Insurance Co. (Chubb). The coverage period under the Automobile Insurance Program is July 16, 2016 through February 16, 2018. This policy provides up to $1,000,000 in coverage, and the annual premium is approximately $56,215. As of the Petition Date, Debtors are current on their premium payments under this policy.

146.    Foreign Liability Insurance Program.    Debtors' Foreign Liability Insurance Program carrier is Generali Insurance Company. The coverage period under this policy is February 16, 2017 through February 16, 2018. The policy provides up to $4,000,000 in

39

aggregate coverage.  The annual premium is approximately $19,724.  As of the Petition Date, Debtors are current on their premium payments under this policy.

147.    Commercial Property Program.  Debtors' Commercial Property Program policy carrier is Continental Casualty Company (CNA).  The coverage period under this policy is February 16, 2017 through February 16, 2018.  The policy limit under this policy is $76,479,035 and the annual premium is approximately $160,590.  As of the Petition Date, Debtors are current on their premium payments under this policy.

148.    Excess Liability Programs.  Debtors have an excess commercial policy with Beazley Insurance Company.  The coverage period under this policy is February 16, 2017 through February 16, 2018.  The policy provides up to $10,000,000 in coverage and the annual premium is approximately $109,529.  As of the Petition Date, Debtors are current on their premium payments under this policy. Debtors also have an excess liability policy with National Fire & Marine Insurance Co. (Berkshire).  The coverage period under this policy is February 16, 2017 through February 16, 2018.  The policy provides up to $5,000,000 in coverage and the annual premium is $50,500.  As of the Petition Date, Debtors are current on their premium payments under this policy.

149.    Ocean Cargo Insurance Program.  The policy carrier for Debtors' Ocean Cargo Insurance Program is Alterra American Insurance Co.  The coverage period under this policy is February 16, 2017 through February 16, 2018.    The policy provides up to $5,000,000 in coverage.  The annual premium for this policy is $4,489.  As of the Petition Date, Debtors are current on their premium payments under this policy.

150.    NTI (Flood) Policy.  Debtors' flood insurance policy carrier is Hartford Insurance Company of the Midwest.  The coverage period under this policy is June 11, 2017 through June

11, 2018. The policy provides up to $500,000 in coverage with a $1,000 deductible. The annual premium for this policy is $2,501. As of the Petition Date, Debtors are current on their premium payments under this policy.

151. <u>Reps and Warranties Coverage</u>. Debtors' Reps and Warranties Coverage is provided by QBE Specialty Insurance Co. The coverage period under this policy is February 6, 2016 through February 6, 2022 for fundamental representations and February 16, 2016 through February 16, 209 for non-fundamental representations. The policy provides up to $5,250,000 in coverage. The annual premium for this policy is $197,182. As of the Petition Date, Debtors are current on their premium payments under this policy.

152. <u>Private Edge Plus Program</u>. Debtors' Private Edge Plus coverage is directors and officers insurance and is provided by National Union Fire Insurance Company of Pittsburgh. The coverage period under this policy is May 31, 2017 through May 31, 2018. The annual premium for this policy is $46,587. As of the Petition Date, Debtors are current on their premium payments under this policy.

153. <u>Excess Edge Plus Program</u>. Debtors' Excess Edge Plus coverage is directors and officers insurance and is provided by National Union Fire Insurance Company of Pittsburgh. The coverage period under this policy is May 31, 2017 through May 31, 2018. The annual premium for this policy is $6,000. As of the Petition Date, Debtors are current on their premium payments under this policy.

154. <u>Commercial Crime Program</u>. Debtors' commercial crime policy is provided by National Union Fire Insurance Company of Pittsburgh. The coverage period under this policy is May 31, 2017 through May 31, 2018. The annual premium for this policy is $22,166. As of the Petition Date, Debtors are current on their premium payments under this policy.

41

155.    The Insurance Programs are vital to Debtors' continued operations. Specifically, applicable state laws mandate that Debtors maintain workers' compensation coverage for their employees. Debtors' failure to pay their obligations under the Workers' Compensation Program could jeopardize their coverage and expose Debtors to significant liability in fines imposed by state workers' compensation boards. In addition, the risk that eligible workers' compensation claimants will not receive timely payments for prepetition employment-related injuries could have a devastating effect on the financial well-being of those claimants and the morale of not just those claimants but also Debtors' active employees. This could result in employee departures, causing a significant disruption in Debtors' business and a materially adverse impact on Debtors' operations, the value of their estates, and the interests of all parties in these Chapter 11 Cases. Accordingly, it is necessary and in all parties' interests for Debtors to pay all obligations on account of their Workers' Compensation Programs.

156.    In addition, under the laws of the states where Debtors do business, they cannot operate their vehicles without auto liability insurance. Similarly, Debtors must maintain most of the Insurance Policies to comply with the operating guidelines of the Office of the United States Trustee for Region 3. Indeed, a number of obligations described above apply to the post-petition period, and Debtors are seeking authorization pay such obligations out of an abundance of caution.

157.    In light of the risks applicable to Debtors' operations and the critical need for Debtors to protect their assets from such risks, it is essential that Debtors maintain the Insurance Programs and pay all the related obligations during the course of these Chapter 11 Cases. Based on Debtors' current circumstances, it is not likely that Debtors will be able to renew or replace their existing Insurance Policies on terms more favorable than those currently offered by the

42

Insurance Carriers. The process of establishing new programs would also be burdensome and costly to Debtors.

158.    Staying the workers' compensation claims could result in employees' departures or otherwise harm employee morale, which would severely disrupt Debtors' business and prevent a successful reorganization.

(7)    **MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO HONOR CERTAIN PREPETITION CUSTOMER PROGRAMS IN THE ORDINARY COURSE OF BUSINESS AND (II) GRANTING CERTAIN RELATED RELIEF**

159.    Prior to the Petition Date, and in the ordinary course of their business, Debtors engaged in a variety of marketing and sales practices designed to develop and sustain positive reputations for Debtors' products in the marketplace and to ensure customer satisfaction and loyalty (collectively, the "**Customer Programs**"). The goals of the Customer Programs are to meet competitive pressures, ensure customer satisfaction, and generate goodwill for Debtors, thereby retaining current customers, attracting new customers, and ultimately enhancing revenue and profitability.

a.    **SSP Program**

160.    Debtors' Savings Passport Club program (the "**SSP Program**") provides benefits to its participants in the form of savings on products, access to special events, and period giveaways. More than one million customers are enrolled in this program. SSP Program members receive a lifetime membership and up to 50% savings on each purchase. Members also earn points based on the amounts spent in the store, resulting in dollar rewards that the customer can apply to his or her next purchase. Members also receive giveaways for their birthday and periodic members-only coupons. The SSP Program also has a VIP option for customers who spend more than $150 in the store. In addition to the benefits received by base program

43

members, VIP members receive privileged access to special events and a special holiday gift. They also receive free shipping with a $25 purchase when shopping online.

161.    The SSP Program is critical to the success of Debtors' business, as SSP Program members account for 96% of Debtors' sales.  This program also provides over one million contacts for Debtors' advertising programs, as members receive daily emails and monthly direct mail advertising Debtors' products.

### b.    Gift Card Program

162.    Debtors also employ a gift card program through which customers may purchase a pre-paid card to use as an alternative to cash for purchases within the store (the "**Gift Cards**"). Gift Cards may be purchased up to $100 and do not expire.  A substantial portion of Debtors' revenue is derived from the sale of Gift Cards, which may be purchased at Debtors' retail stores.

163.    As of July 31, 2017, approximately $273,720.40 worth of Gift Cards issued in the Debtors' retail stores is outstanding.  The Debtors seek authority to continue to honor the Gift Cards in the ordinary course of business during the pendency of these Chapter 11 Cases, whether purchased before or after the Petition Date.

### c.    Returns, Exchanges and Refunds

164.    Certain of Debtors' customers may hold contingent claims against Debtors for refunds, returns, exchanges, substitutions, store credit and other credit balances (collectively, the "**Refunds**").  Subject to certain restrictions and requirements, customers may request a refund or exchange for the full amount of a purchased item.  Unused portions of the return dollar amount are returned to the customer in the form of the original payment. In certain circumstances, such as when the customer no longer possesses the receipt, the customer may exchange his or her purchase for the full retail price.  Additional purchases over the exchange amount may be paid

44

by the customer using cash, check, traveler's check, credit card, and/or gift certificates. Debtors believe that the increase in customer loyalty generated by the Refunds outweighs the cost of the Refunds. Therefore, the Debtors seek authorization to continue to issue Refunds in the ordinary course of business.

165.   The success and viability of Debtors' business is dependent upon the loyalty and confidence of their customers. The continued support of this constituency is absolutely essential to the survival of the Debtors' businesses and the preservation of the value of their estates. Customer relations, loyalty and support are extremely critical and value maximizing. By contrast, if Debtors determine, in their sole discretion, to honor these prepetition obligations, it will require minimal expenditure of estate funds and will assist Debtors in preserving key customer relationships and enhance Debtors' overall value. It will preserve the value of the estates, if Debtors are permitted to continue honoring and/or paying all Customer Program obligations without interruption or modification.

**(8)   MOTION OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE PAYMENT OF CERTAIN PREPETITION SHIPPING CHARGES AND (II) GRANTING CERTAIN RELATED RELIEF**

166.   In the ordinary course of their businesses, Debtors rely on Shippers, freight forwarders, and consolidators identified on **Exhibit C** attached to the motion ("**Shippers**") to transport products and materials to Debtors' manufacturing facilities, retail store locations, and customers. In the twelve months preceding the Petition Date, Debtors paid Shippers an aggregate amount of approximately $5,453,192.00. The success of Debtors' retail business, and of their reorganization, relies upon the shipment and import of Debtors' products (the "**Product**") to Debtors' distribution centers and retail store locations. Failure to pay for the

45

services provided by such Shippers may result in Shippers asserting possessory liens against the Product.

167.   The services of Shippers are critical to Debtors' operations.   Debtors do not believe that they could replace Shippers on an expedited basis so as to avoid disruption of the flow of goods to their customers, nor do Debtors believe it would be prudent to hire new shipping companies and risk that goods will be damaged or lost during the transporting and delivery process.   Unless Debtors are able to continue processing, receiving and delivering Product, their business operations will be severely disrupted, Debtors' customers will be harmed, Debtors' ability to generate revenue will be impaired, and Debtors' reorganization efforts will be hampered.

**(9)   MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDER AUTHORIZING THE PAYMENT OF CERTAIN PREPETITION CLAIMS OF CRITICAL VENDORS AND GRANTING RELATED RELIEF**

168.   Debtors need to pay certain prepetition claims of certain critical vendors (the "**Critical Vendor Claims**") in amounts up to 3,600,000.  The Debtors have determined that the authority to pay the Critical Vendor Claims is critical to their efforts to continue their business. The Debtors depend on the continued delivery of goods and services by the Critical Vendors to seamlessly transition into chapter 11, maintain operations and preserve value for the estates' creditors.  The payment of the Critical Vendor Claims as requested herein is intended to ensure there is no disruption in the Debtors' ability to obtain the products and services necessary to the operation of their business and the preservation and protection of their properties.

169.   The Debtors seek to pay the Critical Vendor Claims only where nonpayment of such claims would lead to the cessation of the delivery of products and/or the provision of

services resulting in a shutdown of all or a portion of the Debtors' operations or where there is no reasonable alternative source for the products or services provided by such Critical Vendor.

170.    Maintaining the products and services provided by the Critical Vendors is vital to the Debtors' continuing business operations and the success of these cases.  The Debtors submit that the amount of the Critical Vendor Claims is small in relation to the value lost if the Debtors experienced a shutdown of their operations, which may occur if relationships with these Critical Vendors were to be terminated.

171.    In these Chapter 11 Cases, payment of the Critical Vendor Claims is essential to the Debtors' reorganization, and thus warranted as a reasonable exercise of the Debtors' business judgment.  Immediate authority to pay the Critical Vendor Claims is essential to ensure that the Debtors' operations are not interrupted and remain constant, timely and efficient.  Should the Debtors' operations be interrupted for even a brief time, the Debtors could suffer severe disruption of their business at multiple locations, with a corresponding loss of customer confidence and estate value.  The Debtors cannot afford any material disruptions of their business operations or present anything less than a "business as usual" appearance.

**(10)    MOTION OF DEBTORS FOR ENTRY OF ORDER AUTHORIZING THE (I) AMENDMENT AND ASSUMPTION OF TRANSITION SERVICES AGREEMENT; (II) ASSUMPTION OF MANAGEMENT AGREEMENT; (III) REJECTION OF SUPPLY AGREEMENT AND (III) COMPROMISE OF CERTAIN CLAIMS IN CONNECTION THEREWITH**

172.    As set forth above, prior to the commencement of these Chapter 11 Cases, Retail entered into the Transition Services Agreement, Management Agreement and Supply Agreement with NBTY.  In this motion, Debtors seek to assume and amend the Transition Services Agreement, extend services under the agreement until October 31, 2017, assume the

47

Management Agreement and reject the Supply Agreement all as of the Petition Date. I believe these actions are in the best interests of the estate.

173.    The Transition Services Agreement and the Management Agreement are vital to the successful reorganization of Debtors' businesses. Debtors assert, in their business judgment, that assumption of the Transition Services Agreement on the amended terms will provide the technical support and access to product needed to sustain Debtors' businesses during the pendency of these Chapter 11 Cases, which will in turn maximize the value of Debtors' estates. Moreover, NBTY has asserted to Debtors that NBTY is permitted to terminate the Transition Services Agreement and cease performing thereunder. Debtors dispute any such termination right and assert that NBTY is obligated to perform all of its obligations under the Transition Services Agreement and that any failure to do so would violate the automatic stay extant under Section 362 of the Bankruptcy Code. Assumption of the Transition Services Agreement would resolve any such disputes of termination and would allow both parties to perform their obligations thereunder going forward.

174.    The Management Agreement is a slightly-misnamed agreement that provides for Debtors' ability to use and operate a retail location located in Bohemia, New York (the "**Bohemia Store**"). The Bohemia Store is a store owned by NBTY that, pursuant to the Management Agreement, VW, Inc. manages and operates. VW, Inc., as a management fee, retains all revenues and receipts accruing from the operation of the Bohemia Store. In Debtors' business judgment, the Bohemia Store is a valuable store, a net money-maker, and is critical to the successful reorganization of Debtors business. Accordingly, assumption of the Management Agreement will maximize value of Debtors estates.

175.    The Supply Agreement, on the other hand, does not provide any value to Debtors or their estates.  Instead, Debtors' continued obligations thereunder would be detrimental to Debtors' efforts to reorganize.  Rejection of the Supply Agreement will eliminate operating costs and will therefore maximize the value of Debtors' estates.  Under the Supply Agreement, Debtors would buy product from NBTY, and NBTY would have to deliver that product, all on certain terms and conditions.  Debtors no longer want or need any product from NBTY under the terms of the Supply Agreement.  Debtors rely entirely on other suppliers to provide them with the products Debtors offer for sale to their customers.  Accordingly, Debtors have determined, in their business judgment, that they no longer require the Supply Agreement, and that it is in the best interest of their estates to reject it.

176.    During the 90-days prior to the Petition Date, Debtors paid to NBTY approximately $2.7 million broken down as follows:

| Payment | Date | Purpose |
|---|---|---|
| $821,834.75 | 6/16/17 | TSA Services |
| $54,676.58 | 6/23/17 | Inventory Purchases |
| $166,928.93 | 6/29/17 | Interest - Seller Note |
| $462.00 | 6/30/17 | Inventory Purchases |
| $249,889.85 | 6/30/17 | Inventory Purchases |
| $574,282.49 | 7/20/17 | TSA Services |
| $250,747.10 | 7/21/17 | Inventory Purchases |
| $462.00 | 7/27/17 | Inventory Purchases |
| $608,257.19 | 8/24/17 | TSA Services |
| **$2,727,540.89** | | |

177.    Following the inventory purchase payments above, NBTY shipped nearly $2 million in product to Debtors for which NBTY has not been paid.

178.    In consideration of NBTY's extension of services under the Transition Services Agreement until October 31, 2017, Debtors have determined that the Compromise of waiving any claims under 11 U.S.C. § 547 against NBTY is in the best interests of Debtors and their estates.  Moreover, the litigation of any claims which will be barred by the Compromise would be costly and burdensome to Debtors' estates.

179.    I believe that the commencement of these Chapter 11 Cases is in the best interests of Debtors' stakeholders and other parties-in-interest.  As they did during the prepetition period, Debtors, with the assistance of their professionals, will continue to maintain and enhance the going concern value of the companies while pursuing their reorganization strategy.

I declare under penalty of perjury that the forgoing is true and correct.

Dated: September 11, 2017

Frank Conley
Authorized Representative

667680.1 09/11/2017