# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Vitamin World, Inc., *et al.*,[1] | Case No. 17-11933 (KJC) |
| Debtors. | Jointly Administered |
| | Proposed Hearing Date: November 21, 2017 at 10:00 a.m. (EST) |
| | Proposed Objection Deadline: November 20, 2017 at 12:00 p.m. (EST) |

**MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER: (I) AUTHORIZING DEBTORS TO ENTER INTO CONSULTING AGREEMENT WITH LIQUIDATION CONSULTANT; (II) AUTHORIZING DEBTORS TO CONDUCT STORE CLOSING OR SIMILAR THEMED SALES; (III) APPROVING DEBTORS' STORE CLOSING PLAN; (IV) AUTHORIZING AND APPROVING STORE CLOSING SALES FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES; (V) APPROVING PROCEDURES TO CONDUCT STORE CLOSINGS IN ADDITIONAL CLOSING STORES; (VI) EXEMPTING THE DEBTORS FROM COMPLIANCE WITH NON-BANKRUPTCY LIQUIDATION LAWS; (VII) EXEMPTING DEBTORS FROM COMPLIANCE WITH ANY CONTRACTUAL RESTRICTIONS PLACED UPON THE CLOSING SALES; AND (VIII) PERMITTING THE DEBTORS TO ABANDON ANY PROPERTY THAT IS BURDENSOME OR OF INCONSEQUENTIAL VALUE**

By this motion (the "Motion"), the debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby seek the entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (i) authorizing the Debtors to enter into the Consulting Agreement (as amended, modified, or restated, and together with all exhibits, the "Closing Store Agreement"), a copy of which is attached hereto as **Exhibit B**, between the Debtors and Gordon Brothers Retail Partners, LLC (the "Liquidation Consultant"); (ii) authorizing the Debtors to conduct store closing sales or

---

[1]     Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Vitamin World, Inc. (2283); VWRE Holdings, Inc. (8915); VW Interholdings, Inc. (4744); VW Online, Inc. (8763); Precision Engineered Limited (USA) (0916); Vitamin World (V.I.), Inc. (9839); Vitamin Depot, LLC (6747); Vitamin World of Guam, LLC (2056); and Nutrition Warehouse, Inc. (5095). Debtors' mailing address is 4320 Veterans Highway, Holbrook, NY 11741.

similar themed sales (collectively, the "Closing Sales") at certain store locations designated by the Debtors on **Exhibit C** (the "Initial Closing Stores") and thereafter at such additional store locations as the Debtors may determine (the "Additional Closing Stores," and together with the Initial Closing Stores, the "Closing Stores") in accordance with the proposed sale guidelines (the "Sale Guidelines") attached hereto as **Exhibit D** and, if applicable, the Additional Closing Store Procedures (defined below), with such sales to be free and clear of all liens, claims, encumbrances, and interests; (iii) approving the Debtors' strategic plan in connection with the closure of non-continuing retail locations (the "Store Closing Plan"); (iv) approving the Additional Closing Store Procedures (as defined below); (v) exempting the Debtors from compliance with certain applicable non-bankruptcy laws that purport to regulate liquidation, similar-themed sales and signage limitations; (vi) exempting the Debtors from compliance with any contractual restrictions placed upon the Closing Sales; and (vii) permitting the Debtors to abandon any property of the estates that is burdensome or of inconsequential value or benefit to the estates. In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.     This Court has jurisdiction to consider the Application pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief requested herein are sections 105(a), 363, 503, 507, and 541 of title 11 of the United States Code, 11 U.S.C. §§ 101 – 1532 (the "Bankruptcy Code") and Rules 2002(a)(2) and 6004 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

669986.5 11/14/2017

## BACKGROUND

### I.     GENERAL BACKGROUND

3.      On September 11, 2017 (the "Petition Date"), each Debtor commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On September 17, 2017, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors of Vitamin World, Inc., *et al.* (the "Committee").

4.      A detailed description of the Debtors' business and operations, and the events leading to the commencement of these Chapter 11 Cases, is provided in the *Declaration of Frank Conley in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 2] and the *Supplement to Declaration of Frank Conley in Support of Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 161] (the "Conley Declarations").

5.      The Debtors are a leading specialty retailer in the vitamins, minerals, herbs and supplements ("VMHS") market. The Debtors offer products across all major VMHS and sports nutrition categories, including supplements, active nutrition, multiples, letter vitamins, health and beauty items, herbs, minerals, food and specialty items. As of the Petition Date, the Debtors employed a total of approximately 1,478 active employees in their 334 retail locations, support center, and management offices, and operated out of four distribution centers located in Holbrook, New York, Sparks, Nevada, Riverside, California and Groveport, Ohio.

6.      Although the Debtors originally intended to proceed with a plan of reorganization in connection with these Chapter 11 Cases, certain unforeseen operational challenges and liquidity concerns have caused the Debtors to now pursue a sale of substantially all of their assets. Indeed, working closely with Wells Fargo Bank, N.A ("Wells Fargo" or the "DIP

3

Lender") and the Committee, as well as the Debtors' other professionals, the Debtors have determined that the best way to preserve value for their estates and creditors is through (i) the sale of a core group of profitable stores as a going concern pursuant to an expedited auction sale process under section 363 (the "Going Concern Sale"), (ii) conducting Closing Sales at the remaining stores post-auction or, in the event there is no buyer interested in a Going Concern Sale, conducting Closing Sales at locations originally intended to be included in the Going Concern Sale in accordance with the Additional Closing Store Procedures, and (iii) immediately commencing Closing Sales at the Initial Closing Stores identified by the Debtors on **Exhibit C** to supplement the Debtors' operating liquidity during the pendency of the auction sale process. The Debtors believe this plan offers the best opportunity to maximize the value to the estates for all creditors and other stakeholders, including preserving as many jobs for their employees as possible.

## II.  THE SALE PROCESS

7.  Upon determining that it was necessary to pursue a sale of substantially all of their assets, the Debtors immediately filed an emergency motion to retain SSG Advisors, LLC ("SSG") as their investment banker to assist the Debtors in the marketing and sale of their assets. This application is currently pending before the Court.

8.  In addition, on November 10, 2017, the Debtors filed the *Debtors' Motion for Entry of (A) Order (I) Scheduling a Hearing to Consider Approval of the Sale or Sales of Substantially All of the Debtors' Assets, and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (II) Approving Certain Bidding Procedures Assumption and Assignment Procedures, and the Form and Manner of Notice Thereof, and (III) Granting Related Relief; and (B) One or More Orders (I) Approving the Sales or Other Acquisition Transactions for the Assets, (II) Authorizing the Sales Free and Clear of All*

*Encumbrances, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (IV) Granting Related Relief* [D.I. 374] (the "Bidding Procedures and Sale Motion"), seeking, among other things, (a) authorization to enter into an asset purchase agreement to sell substantially all of the Debtors' assets to a Successful Bidder (as defined therein) and (b) approval of the Debtors' proposed sale process, which contemplates the continued marketing of substantially all of the Debtors' assets and business lines up through the auction.

## III.     THE LIQUIDATION CONSULTANT

### A.     The Debtors' Need To Close Certain Stores.

9.      While the Debtors are optimistic that a retail purchaser will emerge that will purchase a significant portion of the Debtors' assets as a going concern, they recognize that it is unlikely that a retail buyer will want to acquire *all* of their retail locations (collectively, the "Stores") or all of their retail inventory.

10.      In fact, the Debtors have determined that 124 of their Stores, which are listed on **Exhibit C** attached hereto, should be closed as soon as possible. A number of factors led the Debtors to this conclusion. First, each of the Initial Closing Stores has substantial operating costs and historically have had lower profitability, and poor recent and projected sales. Second, none of the Initial Closing Stores is expected to generate material liquidity for the estates if they were to stay open beyond December. Finally, the Debtors do not believe that closing the Initial Closing Stores will negatively impact the value of the Debtors' assets at the auction.

11.      Closing the Initial Closing Stores as soon as possible will also lower the Debtors' costs and reduce cash burn. The liquidation of assets in the Initial Closing Stores is expected to yield proceeds to be used by the Debtors in accordance with the terms of DIP Facility. Thus, the Debtors believe that liquidating the Initial Closing Stores promptly—before any auction in

669986.5 11/14/2017

connection with the Going Concern Sale process is held—will maximize value to all stakeholders.

12.     As noted above, in the event that the Debtors conclude that there is no buyer interested in a Going Concern Sale, the Debtors seek authority to conduct Closing Sales at the locations originally intended to be included in the Going Concern Sale in accordance with the Additional Closing Store Procedures.  In determining whether to conduct Closing Sales at an such Stores, the Debtors will analyze each Store location, considering a number of factors such as current store operating costs (including occupancy and labor), historical store profitability, recent and projected sales, and the Debtors' historical ability to sell high volumes of product on clearance through the Store.

**B.     The Debtors' Process of Hiring the Liquidation Consultant.**

13.     Given the potential breadth of the Store Closing Sales, the Debtors have determined that hiring a liquidation consultant to assist them in running Store Closing Sales – including by providing supervisors to oversee the sales in-store, providing additional personnel to operate the Closing Stores as needed and recommending the appropriate mix and distribution of inventory among Closing Stores – would better enable them to maximize the value of their assets in these Cases.

14.     In selecting a liquidation consultant, the Debtors solicited proposals from six nationally recognized liquidation consulting firms. The Debtors provided each of the firms with extensive diligence information, including inventory and sales reports, and ultimately received four proposals for liquidation services to be provided on a fee (as opposed to equity) basis.

15.     The Debtors have decided to retain the Liquidation Consultant because the Debtors, in consultation with SSG, determined that the Liquidation Consultant's proposal offered the best value in terms of realization of net proceeds, execution risk, and timing.   The

6

Liquidation Consultant has extensive expertise in conducting store closing sales so as to be able to manage the orderly liquidation of the Merchandise (as defined in the Closing Store Agreement) and certain furniture, fixtures, equipment and other assets that the Debtors do not wish to retain (collectively, the "Offered FF&E," and collectively with the Merchandise and any other assets located in a Closing Store, the "Store Assets") at the respective Closing Stores. The Debtors believe that the DIP Lender and the Committee support the Debtors' engagement of the Liquidation Consultant. In short, the Liquidation Consultant was retained because it is best suited to assist the Debtors in maximizing the value of the assets at the Closing Stores for the benefit of the Debtors and their creditors.

16.     Notably, neither the Liquidation Consultant, nor any of the liquidation consulting firms that submitted proposals to the Debtors, will be precluded from bidding in connection with the Going Concern Sale.

C.     **The Closing Agreement with Liquidation Consultant.**

17.     The Debtors negotiated the terms and conditions of the Closing Store Agreement in good faith and at arms' length. The material terms of the Closing Store Agreement are summarized in the table below. In the event of a conflict between the summary below and the Closing Store Agreement, the terms of the Closing Store Agreement shall control.

| TERM | DESCRIPTION |
|---|---|
| **Debtor Parties** | Vitamin World, Inc. |
| **Term of Closing Sales**<br><br>Closing Store Agreement § 3. | For each Store, the Sale shall commence on or about November 21, 2017 (the "Sale Commencement Date") and is expected to run for approximately 10 full weeks but shall conclude no later than January 28, 2018 (the "Sale Termination Date"); provided, however, that the Parties may mutually agree in writing to extend or terminate the Sale at any Store prior to the Sale Termination Date. |

669986.5 11/14/2017

| TERM | DESCRIPTION |
|---|---|
| | At the conclusion of the Sale at each Store, Consultant shall surrender the premises for such Store to Merchant in broom clean condition; provided, that unsold FF&E may be abandoned by Consultant in place at the Stores without any cost or liability of any kind to Consultant. |
| **Services Provided by Liquidation Consultant**<br><br>Closing Store Agreement § 4(A). | During the Sale Term, Consultant shall provide Merchant with the following services with respect to the conduct of the Sale: (a) provide qualified supervisors (the "Supervisors") engaged by Consultant to oversee the Sale of the Merchandise from the Stores; (b) determine appropriate point-of-sale and external advertising for the Stores, approved in advance by Merchant; (c) determine appropriate discounts with respect to Merchandise, staffing levels for the Stores approved in advance by Merchant, and appropriate bonus and incentive programs, if any, for the Stores' employees, approved in advance by Merchant; (d) oversee display of Merchandise for the Stores; (e) evaluate sales of Merchandise by category and sales reporting and monitor expenses; (f) maintain the confidentiality of all proprietary or non-public information regarding Merchant in accordance with the provisions of the confidentiality agreement signed by the Parties; (g) assist Merchant in connection with managing and controlling loss prevention and employee relations matters; and (h) provide such other related services deemed necessary or appropriate by Merchant and Consultant. |
| **Debtors' Undertakings**<br><br>Closing Store Agreement § 4(B). | During the Sale Term, the Debtors shall (a) be the employer of the Stores' employees, and provide employees at the Stores; (b) prepare and process all tax forms and other documentation; (c) collect and pay all sales taxes; (d) use reasonable efforts to cause Debtors' employees to cooperate with the Consultant and the Supervisors; (e) execute all agreements determined by the Merchant and Consultant to be necessary or desirable for the operation of the Stores during the Sale; (f) arrange for the ordinary maintenance of all point-of-sale equipment required for the Stores; (g) ensure that Consultant has quiet use and enjoyment of, and reasonable access to, the Stores for the Sale Term in order to perform its obligations; and (h) provide throughout the Sale Term central administrative services necessary for the Sale, including, without limitation, customary POS administration, sales audit, cash reconciliation, accounting, and payroll processing, current credit card systems and servicing arrangements, all at no cost to Consultant. |

| TERM | DESCRIPTION |
|---|---|
| **Closing Stores**<br><br>Closing Store Agreement Recital, Exhibit A | 124 Closing Stores identified on **Exhibit C** to this Motion and thereafter at such additional store locations as the Debtors may determine. |
| **Expenses of Liquidation Consultant**<br><br>Closing Store Agreement § 6(iii). | Merchant shall be solely responsible for all expenses of the Sale, including, without limitation, (A) all Store-level operating expenses and (B) to the extent in compliance with the Expense Budget (as defined below), the reasonable fees and expenses of Consultant's legal counsel incurred in connection with the negotiation of, and entrance into and obtaining approval of, the Agreement, Consultant's performance under the Agreement and the conduct of the Sale.<br><br>To control expenses of the Sale, Merchant and Consultant have established an aggregate budget for Store-level expenses directly incurred by Consultant (the "Expense Budget"), which the Consultant shall not exceed in the aggregate absent Merchant's written consent. The parties will in good faith expeditiously and mutually agree upon the Expense Budget prior to the Sale Commencement Date. |
| **Compensation for Liquidation Consultant**<br><br>Closing Store Agreement §§ 6(ii), 10. | In consideration of its services hereunder with respect to the Stores, Consultant shall earn a fee (the "Merchandise Fee") equal to the product of the Gross Proceeds of the Merchandise and the percentage determined pursuant to the following table, back to first dollar "Consultant's Percentage"): |

| Recovery Percentage | Consultant's Percentage |
|---|---|
| Below 135.0% | 0.75% |
| Between 135.1%-145.0% | 1.50% |
| Between 145.1%-150.0% | 1.75% |
| Above 150.1% | 2.00% |

669986.5 11/14/2017

In the event Merchant elects to add additional stores into the Sale, then solely as to those additional stores identified on a Store Listing Supplement, the Merchandise Fee for such stores shall be tested on the following Recovery Percentage in such stores based on the following Consultant's Percentage for such stores, back to first dollar:

| Recovery Percentage | Consultant's Percentage |
| --- | --- |
| Below 135.0% | 0.75% |
| Between 135.1%-145.0% | 1.25% |
| Between 145.1%-150.0% | 1.50% |
| Above 150.1% | 1.75% |

On a weekly basis in connection with each weekly reconciliation contemplated by the Agreement, Merchant shall pay Consultant an amount equal to three quarters percent (0.75%) of Gross Proceeds of Merchandise on account of the prior week's sales as an advance on account of the Merchandise Fee.

Consultant shall be entitled to a commission from the sale of the Owned FF&E equal to fifteen percent (15.0%) of the Gross Proceeds of the sale of the Owned FF&E (the "FF&E Fee").

| | |
| --- | --- |
| **Commission to Debtors for Sale of Additional Merchandise**<br><br>Closing Store Agreement § 6(v). | Consultant shall have the right to supplement the Merchandise in the Sale with additional goods that (i) are of like kind and no lesser quality to the Merchandise in the Sale, (ii) were on-order or in-transit from Merchant's existing vendors or are procured from other vendors, in all cases with Merchant's consent, and (iii) are procured by Consultant for inclusion in the Sale ("Additional Merchandise").<br><br>Merchant shall each be entitled to forty percent (40.0%) of the Gross Margin earned from the sale of Additional Merchandise (such amount, the "Additional Merchandise Fee"). "Gross Margin" shall mean the Gross Additional Proceeds earned from the sale of Additional Merchandise during the Sale Term, net of Sales Taxes, less Cost of Goods Sold. "Gross Additional Proceeds" shall include the proceeds received from the sale of Additional Merchandise in any form of payment accepted, including for the avoidance of doubt, the dollar value of any gift card, merchandise credit, or similar tender accepted pursuant thereto. "Cost of Goods Sold" shall include all Consultant expenses directly related and incrementally incurred relating to |

10

| | |
|---|---|
| | the Additional Merchandise, including without limitation, merchandise invoice costs and the applicable taxes, procurement, shipping, freight, duty, tariff, import, currency exchange, and ticketing. Consultant shall retain all remaining amounts from the sale of the Additional Merchandise. |
| **Debtor's Insurance Obligations**<br><br>Closing Store Agreement § 8(A). | Merchant shall maintain throughout the Sale Term, liability insurance policies (including, without limitation, products liability (to the extent currently provided), comprehensive public liability insurance and auto liability insurance) covering injuries to persons and property in or in connection with the Stores, and shall cause Consultant to be named an additional insured with respect to all such policies. At Consultant's request, Merchant shall provide Consultant with a certificate or certificates evidencing the insurance coverage required hereunder and that Consultant is an additional insured thereunder. In addition, Merchant shall maintain throughout the Sale Term, in such amounts as it currently has in effect, workers compensation insurance in compliance with all statutory requirements. |
| **Indemnification by Liquidation Consultant**<br><br>Closing Store Agreement § 7(ii). | Consultant shall indemnify, defend and hold Merchant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, and affiliates (other than the Consultant or the Consultant Indemnified Parties) (collectively, "Merchant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to (a) the willful or grossly negligent acts or omissions of Consultant or the Consultant Indemnified Parties; (b) the material breach of any provision of, or the failure to perform any material obligation under, this Agreement by Consultant; (c) any liability or other claims made by Consultant's Indemnified Parties or any other person (excluding Merchant Indemnified Parties) against a Merchant Indemnified Party arising out of or related to Consultant's conduct of the Sale, except claims arising from Merchant's negligence, willful misconduct, or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortuous or otherwise actionable treatment of Merchant Indemnified Parties, or Merchant's customers by Consultant or any of the Consultant Indemnified Parties; and (e) any claims made by any party engaged by Consultant as an employee, agent, representative or independent contractor arising out of such engagement. |

669986.5 11/14/2017

| Indemnification by Debtors<br><br>Closing Store Agreement § 7(i). | Merchant shall indemnify, defend, and hold Consultant and its consultants, members, managers, partners, officers, directors, employees, attorneys, advisors, representatives, lenders, potential co-investors, principals, affiliates, and Supervisors (collectively, "Consultant Indemnified Parties") harmless from and against all liabilities, claims, demands, damages, costs and expenses (including reasonable attorneys' fees) arising from or related to: (a) the willful or negligent acts or omissions of Merchant or the Merchant Indemnified Parties (as defined below); (b) the material breach of any provision of the Agreement by Merchant, or the failure to perform any material obligation under the Agreement by Merchant; (c) any liability or other claims, including, without limitation, product liability claims, asserted by customers, any Store employees (under a collective bargaining agreement or otherwise), or any other person (excluding Consultant Indemnified Parties) against Consultant or an Consultant Indemnified Party, except claims arising from Consultant's gross negligence, willful misconduct or unlawful behavior; (d) any harassment, discrimination or violation of any laws or regulations or any other unlawful, tortuous or otherwise actionable treatment of Consultant's Indemnified Parties or Merchant's customers by Merchant or Merchant's Indemnified Parties; and (e) Merchant's failure to pay over to the appropriate taxing authority any taxes required to be paid by Merchant during the Sale Term in accordance with applicable law. |

18.    The Debtors are seeking to enter into the Liquidation Consulting Agreement so that they can benefit from the experience and resources that the Liquidation Consultant has in performing large-scale liquidations, while at the same time retaining control over the sale process. The Debtors believe this arrangement will maximize returns to creditors and provide for an efficient liquidation of their retail inventory, to the extent necessary. This arrangement will also allow the Debtors to work with the Liquidation Consultant to commence the Store Closing Sales in the Initial Closing Stores now, and to prepare for any future Closing Sales to ensure that there is no delay in commencing additional Closing Sales should they ultimately become necessary.

## IV. STORE CLOSING PLAN

19. The Debtors have begun the process of preparing for the Closing Sales. This process has included, among other things, the following preparations:

- Analyzing inventory to determine which inventory should be classified as "liquidation inventory" and which inventory should be retained for ordinary course sales in going-forward stores;

- Adopting measures to facilitate a reallocation and redistribution of inventory across stores with an eye toward aggregating liquidation inventory across Closing Stores;

- Preparing to order customized specialty banners and signs to announce the Closing Sales at the Closing Stores;

- Preparing a communication plan for informing and engaging with their employees at the Closing Stores about the impending Closing Sales; and

- Preparing for the posting price markdowns throughout the Closing Stores and marking inventory at the Closing Stores to reflect the price markdowns.

20. Additionally, prior to the execution of the Closing Store Agreement, but subject to the terms and conditions of a confidentiality agreement by and among the Liquidation Consultant and the Debtors, the Liquidation Consultant began the process of familiarizing itself with the Debtors' operations, the Closing Stores, the Merchandise, and other Store Assets.

## RELIEF REQUESTED

21. By this Motion, the Debtors seek the entry of an order, substantially in the form of the Proposed Order: (i) authorizing the Debtors to enter into the Closing Store Agreement with the Liquidation Consultant; (ii) authorizing the Debtors to conduct Closing Sales at the Closing Stores in accordance with the Sale Guidelines, with such sales to be free and clear of all liens, claims, encumbrances, and interests; (iii) approving the Debtors' Store Closing Plan; (iv) approving the Additional Closing Store Procedures (as defined below); (v) exempting the Debtors from compliance with certain applicable non-bankruptcy laws that purport to regulate

13

liquidation, similar-themed sales, and signage limitations; (vi) exempting the Debtors from compliance with any contractual restrictions placed upon the Closing Sales; and (vii) permitting the Debtors to abandon any property of the estates that is burdensome or of inconsequential value or benefit to the estates (the "Remaining Property").

## BASIS FOR RELIEF REQUESTED

22.     Section 105(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). In turn, section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1)

23.     Under section 363(b), courts require only that the debtor "show that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel Corp.*); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*). Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also Stanziale v. Nachtomi (In re Tower Air, Inc.)*,

416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

24.     Under these standards, if a valid business justification exists, the law vests the debtor's decision to use property outside of the ordinary course of business with a strong presumption "'that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985))

25.     Courts have approved store closing plans and store closing agreements similar to those proposed herein in recent chapter 11 cases involving large retail debtors on numerous occasions. *See, e.g., In re Sports Authority Holdings, Inc.,* Case No. 16-10527 (Bankr. D. Del. March 3, 2016); *In re Quicksilver, Inc.,* Case No. 15-11880 (Bankr. D. Del. Oct. 7, 2015); *In re RadioShack Corp.,* Case No. 15-10197 (Bankr. D. Del. Feb. 6, 2015); *In re Coldwater Creek Inc.,* Case No. 14-10867 (Bankr. D. Del. May 7, 2014)).

I.     **The Closing Store Agreement and Store Closing Plan are Supported By Sound Business Justifications**

26.     The Debtors seek approval of, and authority to enter into, the Closing Store Agreement with Liquidation Consultant pursuant section 363(b) of the Bankruptcy Code as a sound exercise of the Debtors' business judgment and as being in the best interests of creditors and their estates.

27.     In consultation with their advisors, the Debtors engaged in an exhaustive analysis of their ongoing and future business prospects. The Debtors determined that the best available path forward to maximize the value of their assets and protect the interests of stakeholders was to implement the Store Closing Plan in connection with a sale of substantially all of their assets to

15

one or more buyers on a going concern basis. As a result, the Store Closing Plan is part of the overall strategy developed by the Debtors as the best alternative to maximize the recovery of the Store Assets.

28. Moreover, the Liquidation Consultant is an experienced retail liquidation consultant and will facilitate the Closing Sales in a manner that will help the Debtors maximize their recovery on the Merchandise and the Offered FF&E located at the Closing Stores, which will in turn maximize value for the Debtors' estates and creditors. Importantly, engaging the Liquidation Consultant will enable the Debtors to rapidly and efficiently commence the Closing Sales at the 124 Initial Closing Stores, the sale proceeds from which are a critical component of the Debtors' plan to supplement operating liquidity during the expedited auction sale process for the going concern stores. The Debtors believe that these Initial Closing Stores will not be part of any going concern sale. Most of the Stores are underperforming or unprofitable, and thereby do not generate positive cash flow or negatively impact liquidity.

29. Furthermore, allowing Closing Sales to proceed in accordance with the Sale Guidelines will allow the Debtors to most efficiently and quickly monetize the Store Assets in a uniform and orderly process with the assistance of an experienced Liquidation Consultant. The Debtors thus believe that they will realize significant benefits by entering into and performing under the Closing Store Agreement and thereby allowing the Liquidation Consultant to manage Closing Sales at the Closing Stores. Given the complexity of the Closing Sales across various states and given the multitude of stores, the Liquidation Consultant will provide invaluable strategic, managerial, and marketing services, allowing the Debtors to focus their efforts on other key aspects of their restructuring efforts. Efficient and effective liquidation sales and procedures, as contemplated the Sale Guidelines and the services to be provided by Liquidation

Consultant, will also allow the Debtors to more quickly vacate closed locations and avoid the accrual of unnecessary administrative expenses.

30.     If the Debtors are not authorized to enter into the Closing Store Agreement with the Liquidation Consultant and immediately implement the Store Closing Plan, the Debtors will lose invaluable time and impose greater risk upon their restructuring plans. Ultimately, any such disruption and delay would materially increase the Debtors' administrative expenses and overall losses, without any associated benefits of such delays to their estates.

**II.     The Store Assets Should Be Sold Free and Clear of Liens, Claims, and Encumbrances**

31.     A debtor in possession may sell property under section 363(b) and section 363(f) of the Bankruptcy Code "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied:

> (1) applicable non-bankruptcy law permits the sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is a bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

32.     Any one of the five conditions, including the consent of the lienholders, provides authority to sell free and clear of liens. *Citicorp Homeowners Services, Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988). To the extent a secured creditor or lienholder that receives notice does not file a written objection to the Motion, such party should be deemed to have consented to the sale. *In re Shary,* 152 B.R. 724, 725-26 (Bankr. N.D. Ohio 1993).

17

33.     The Debtors request approval to sell the Store Assets on a final "as is" basis, free and clear of any lien, claim, or encumbrance in accordance with section 363(f) of the Bankruptcy Code.  The Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) in connection with any lien, claim or encumbrance that a party may assert against the Store Assets.  The Debtors expect that the DIP Lender will consent to the sales. Furthermore, the Debtors propose that any such liens, claims, and encumbrances be transferred and attach to the proceeds of the Closing Sales, as applicable, with the same priority and subject to the same rights, claims, defenses and objections, if any, of all parties.

34.     Courts have approved similar relief in several recent chapter 11 cases involving retail debtors.  *See, e.g., In re Sports Authority Holdings, Inc.,* Case No. 16-10527 (Bankr. D. Del. March 3, 2016); *In re Quicksilver, Inc.,* Case No. 15-11880 (Bankr. D. Del. Oct. 7, 2015); *In re RadioShack Corp.,* Case No. 15-10197 (Bankr. D. Del. Feb. 20, 2015).

35.     Because the Debtors expect to satisfy one or more of the requirements of section 363(t), approval of the sale of the Debtors' Assets free and clear of all interests is warranted. Accordingly, the Debtors request that the order approving the sale of the Store Assets provide that such sale is free and clear of all liens, claims, and encumbrances in accordance with section 363(f) of the Bankruptcy Code.

### III.    The Procedures Relating to the Additional Closing Stores Should Be Approved

36.     Next, the Debtors request that the Sale Guidelines and Proposed Order apply to any Additional Closing Stores in accordance with the procedures described herein (the "Additional Closing Stores Procedures").  Specifically, in order to provide landlords and other parties in interest with information regarding the ultimate disposition of the Stores, to the extent that the Debtors seek to conduct Closing Sales at any Additional Closing Stores, the Debtors will file a list of such Additional Closing Stores with the Court (the "Additional Closing Store List")

18

and serve a notice of their intent to conduct Closing Sales at the Additional Closing Stores on the applicable landlords (the "<u>Additional Closing Store Landlords</u>") by email (to the extent available to the Debtors) or overnight mail at the notice address set forth in the lease for such Additional Closing Store (or, if none, at the last known address available to the Debtors).

37.     The Debtors propose that the Additional Closing Store Landlords (each of whom will have already been served with this Motion and the Proposed Order) have 7 days after service of the applicable Additional Closing Store List to object to the application of the Proposed Order to their Stores. If no timely objections are filed with respect to the application of the Proposed Order to an Additional Closing Store, then the Debtors should be authorized, pursuant to sections 105(a), and 363(b) and (f) of the Bankruptcy Code, to proceed with conducting a Store Closing Sale at the Additional Closing Store in accordance with the Proposed Order, the Sale Guidelines, and the Liquidation Consulting Agreement.

38.     If any objections are filed with respect to the application of the Proposed Order to an Additional Closing Store, and such objections are not resolved, the objections and the application of the Proposed Order to the Additional Closing Store will be considered by the Court at the next regularly scheduled omnibus hearing, or at an earlier hearing to the extent necessary so that the Debtors can move promptly to maximize value and minimize expenses for the benefit of their creditors and stakeholders. *See In re Golfsmith International Holdings, Inc.*, No. 16-12033 (LSS) (Bankr. D. Del. Oct. 13, 2016) (approving similar procedures for supplemental stores); *In re Orchard Supply Hardware Stores Corp.*, No. 13-11565 (CSS) (Bankr. D. Del. June 28, 2013) (same); *In re Aeropostale, Inc.*, No. 16-11275 (SHL) (Bankr. S.D.N.Y. Jun, 9, 2016) (same); *In re The Great Atlantic & Pacific Tea Company, Inc.*, No. 15-23007 (RDD) (Bankr. S.D.N.Y. Aug. 11, 2015) (same).

19

**IV.     The Closing Sales Should Be Exempt From Liquidation Laws**

39.     The Debtors recognize that various "Liquidation Laws," including but not limited to state and local rules, laws, ordinances, and regulations that relate to permitting, licensing, signage, bonding, waiting periods, time limits, bulk sale restrictions, and other related laws governing the conduct of store closing, liquidation, or other inventory clearance sales, may apply in certain states in which the Closing Stores are located.  Such Liquidation Laws often provide that court-ordered liquidation sales are exempt from compliance therewith.   In the event, however, that a Liquidation Law does not expressly waive compliance therewith of a court-supervised bankruptcy sale, the Debtors submit that such Liquidation Law should be deemed to be waived to the extent that it conflicts with section 363 of the Bankruptcy Code.

40.     Here, the Closing Sales are already subject to this Court's supervision.  *See* 28 U.S.C. § 1334.  Therefore, this Court is able to supervise the Closing Sales and such supervision adequately protects the public interest and the Debtors' creditors.   Moreover, section 363 requires the Debtors to operate their businesses in a way that maximizes recoveries for creditors, but compliance with Liquidation Laws could constrain the Debtors' ability to marshal and maximize assets for the benefit of creditors.  The Closing Sales are a legitimate method by which the Debtors can maximize returns from the sale of the Store Assets for the benefit of their estates, their creditors, and their stakeholders, in accordance with the obligations under section 363.

41.     Based on the foregoing, to the extent that any Liquidation Laws purport to interfere with the Closing Sales, the Debtors seek authority to nevertheless proceed with the Closing Sales without the necessity of, and the delay associated with, complying with such Liquidation Laws (except health and safety laws), which would otherwise require the Debtors to obtain various state licenses or permits, observe state and local waiting periods or time limits, or satisfy any additional requirements with respect to advertising or conducting the Closing Sales,

20

or transferring merchandise among the Debtors' various stores and distribution centers. Specifically, the Debtors submit that such Liquidation Laws should be deemed inapplicable given this Court's supervision of the Closing Sales. The Debtors further request that no other person or entity, including any governmental unit, such as any federal, state, or local agency, department, or governmental authority, or any lessor be allowed to take any action to prevent, interfere with, or otherwise hinder the conduct of the Closing Sales, including the advertisement and promotion of the Closing Sales, as contemplated in the Closing Store Agreement and in accordance with the Sale Guidelines.

42.     The Debtors propose that, to the extent that any governmental unit or other party, including a lessor associated with any Closing Store, seeks to dispute a Closing Sale at a Closing Store on the basis of one or more Liquidation Laws, such party may serve a notice of liquidation dispute on the Debtors, in accordance with the resolution procedures described in this Motion and set forth in the Proposed Order.

43.     Lastly, such relief has been granted to other retail debtors under similar circumstances on several occasions. *See, e.g., In re Sports Authority Holdings, Inc.,* Case No. 16-10527 (Bankr. D. Del. March 3, 2016); *In re Quicksilver, Inc.,* Case No. 15-11880 (Bankr. D. Del. Oct. 7, 2015); *In re RadioShack Corp.,* Case No. 15-10197 (Bankr. D. Del. Feb. 20, 2015); *In re Coldwater Creek Inc.,* Case No. 14-10867 (Bankr. D. Del. May 7, 2014); *In re Namco, LLC,* Case No. 13-10610 (Bankr. D. Del. Apr. 12, 2013); *In re Borders Grp., Inc.,* Case No. 11-10614 (Bankr. S.D.N.Y. July 21, 2011); *In re Blockbuster Inc.,* Case No. 10-14997 (Bankr. S.D.N.Y. Jan. 20, 2011); *In re Anchor Blue Retail Grp.,* Case No. 09-11770 (Bankr. D. Del. June 18, 2009).

669986.5 11/14/2017

## V.     Any Contractual Restrictions On Closing Sales Should Be Waived

44.     Next, the Debtors recognize that the Closing Sales and the Sale Guidelines may be inconsistent with certain "Contractual Restrictions" contained in leases, agreements, licenses, recorded documents or other obligations applicable to certain Closing Stores. The Debtors request, however, that the Court override or invalidate any Contractual Restrictions that may impair the Debtors' ability to conduct the Closing Sales at the Closing Stores.

45.     Store closing or liquidation sales have become a routine aspect of chapter 11 cases involving retail debtors. Such sales are consistently approved by courts despite provisions in various contractual and recorded documents that seek and purport to prohibit or restrict such sales. *See In re R.H. Macy & Co.,* 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (finding that restrictive lease provision was unenforceable against debtor seeking to conduct going-out-of-business sale "because it conflicts with the Debtor's fiduciary duty to maximize estate assets"); *In re Ames Dep't Stores, Inc.,* 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) ("[T]o enforce the anti-[going out-of-business] sale clause of the Lease would contravene overriding federal policy requiring Debtor to maximize estate assets by imposing additional constraints never envisioned by Congress."); *In re Tobago Bay Trading Co.,* 112 B.R. 463, 467 (Bankr. N.D. Ga. 1990) (finding clause in lease prohibiting going-out-of-business sales to be unenforceable).

46.     Here, for the reasons discussed in this Motion, the Closing Sales are an essential and critical component of the Debtors' restructuring strategy. Therefore, any Contractual Restrictions that would prohibit, restrict, or otherwise interfere with the Closing Sales should be deemed unenforceable.

47.     Courts have granted similar relief in other bankruptcy cases involving retail debtors, holding that restrictive provisions in various documents are impermissible restraints on a debtor's ability to maximize the value of its assets under section 363 of the Bankruptcy Code.

22

*See, e.g., In re Sports Authority Holdings, Inc.,* Case No. 16-10527 (Bankr. D. Del. March 3, 2016); *In re Quicksilver, Inc.,* Case No. 15-11880 (Bankr. D. Del. Oct. 7, 2015); *In re RadioShack Corp.,* Case No. 15-10197 (Bankr. D. Del. Feb. 20, 2015); *In re Coldwater Creek Inc.,* Case No. 14-10867 (Bankr. D. Del. May 7, 2014); *In re Namco, LLC,* Case No. 13-10610 (Bankr. D. Del. Apr. 12, 2013); *In re Borders Grp., Inc.,* Case No. 11-10614 (Bankr. S.D.N.Y. July 21, 2011); *In re Blockbuster Inc.,* Case No. 10-14997 (Bankr. S.D.N.Y. Jan. 20, 2011).

48.    Accordingly, the Debtors respectfully request that the Court waive the applicability of, or deem unenforceable, any Contractual Restrictions with respect to any Closing Stores that could otherwise inhibit the Debtors' ability to conduct the Closing Sales.

## VI.    The Debtors Should Be Authorized to Abandon Remaining Property

49.    Section 554 of the Bankruptcy Code provides that after notice and a hearing, a debtor "may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(a); *see also Hanover Ins. Co. v. Tyco Indus., Inc.,* 500 F.2d 654, 657 (3d Cir. 1974) ("[A trustee] may abandon his claim to any asset, including a cause of action, he deems less valuable than the cost of asserting that claim."). *See, e.g., In re Contract Research Solutions, Inc.,* Case No. 12-11004, 2013 WL 1910286, at *4 (Bankr. D. Del. May 1, 2013) ("[A debtor] need only demonstrate that [it] has exercised sound business judgment in making the determination to abandon.").

50.    Here, in accordance with the Sale Guidelines, and with the aid of the Liquidation Consultant, the Debtors will make every reasonable effort to sell all Store Assets at the Closing Stores as quickly and efficiently as possible for the purpose of monetizing such assets and vacating the Closing Stores as soon as possible. As described in the Motion, the Debtors are seeking to liquidate Merchandise as well as Offered FF&E located at each of the Closing Stores, in consultation with the Liquidation Consultant. However, during the course of the Closing

23

Sales, the Debtors may determine that the costs associated with the continued storage and sale efforts respecting certain Merchandise or Offered FF&E is likely to exceed the projected proceeds that could be realized from the sale thereof, or that certain Merchandise, Offered FF&E or other remaining Stores Assets may have low prospects for resale. In such event, any remaining Store Assets would likely impose a financial burden on the estates, in the form of storage and removal costs, but are unlikely to provide much, if any, value in return to the estates.

51.     To maximize the value of the Debtors' assets and to minimize unnecessary costs to the estates, the Debtors respectfully request authority to designate any property located at the Closing Stores as Remaining Property and to abandon such Remaining Property located at any of the Closing Stores once the applicable Closing Sale has terminated without incurring liability to any person or entity. Before designating any assets as Remaining Property or abandoning any Remaining Property at any Closing Store, the Debtors will have determined in the exercise of their sound business judgment and in consultation with the Liquidation Consultant that such Remaining Property to be abandoned by the Debtors is either (a) burdensome to the estates because removal and storage costs for the Remaining Property are likely to exceed any net proceeds therefrom or (b) of inconsequential value or benefit to the estates.

52.     Similar relief for other retail debtors has been approved by courts under similar circumstances in recent bankruptcy cases. *See, e.g., In re Sports Authority Holdings, Inc.,* Case No. 16-10527 (Bankr. D. Del. Mar. 3, 2016); *In re Coldwater Creek Inc.,* Case No. 14-10867 (Bankr. D. Del. Dec. 2, 2015); *In re Quicksilver, Inc.,* Case No. 15-11880 (Bankr. D. Del. Oct. 7, 2015).

53.     Notably, the Debtors will use all commercially reasonable efforts to remove, or cause to be removed, any confidential or personal identifying information (which alone or in

conjunction with other information identifies an individual, including, but not limited to, an individual's name, social security number, date of birth, government-issued identification number, account number, and credit or debit card number) in any of the Debtors' hardware, software, computers or cash registers or similar equipment that constitute any Offered FF&E or any Remaining Property before any such property is sold or abandoned.

54.     Accordingly, the Debtors respectfully request Court authorization to designate and thereafter abandon Remaining Property if they determine that the benefits of retaining such property for storage or resale are greater than the costs of retention.

## VII.     Waiver of Rule 6004 is Appropriate

55.     Bankruptcy Rule 6004 provides that an order authorizing the sale of a debtor's property is stayed for a period of 14 days after entry of the order unless the court orders otherwise. *See* Fed. R. Bankr. P. 6004(h). In the present case, the Debtors respectfully request that any order approving the relief requested herein be effective immediately. As described above, the relief sought herein is necessary for the Debtors to realize maximum return from the Closing Sales and liquidations, provide needed operating liquidity, and ultimately, to preserve maximum value for their estates and creditors. There is no just reason for delaying the effectiveness of any such order entered by the Court.

## NOTICE

56.     Notice of this Motion and any order entered hereon will be provided to (i) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Linda J. Casey, Esq.); (ii) each of Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) counsel to Wells Fargo Bank, National Association, Debtors' prepetition secured lender, (x) Riemer Braunstein LLP, Three Center Plaza, Suite 600, Boston, MA 02108 (Attn: Donald E. Rothman, Esq.) and Times Square

669986.5 11/14/2017

Tower, Seven Times Square, Suite 2506, New York, NY 10036 (Attn: Steven E. Fox, Esq.), and

(y) Ashby & Geddes, P.A. 500 Delaware Avenue, P.O. Box 1150, Wilmington, DE 19899 (Attn:

Gregory Taylor, Esq.); (iv) counsel to the Official Committee of Unsecured Creditors,

Lowenstein Sandler LLP, One Lowenstein Drive, Roseland, NJ 07068 (Attn: Mary E. Seymour,

Esq. and Bruce Buechler, Esq.) and Whiteford, Taylor & Preston LLC, The Renaissance Centre,

405 North King Street, Suite 500, Wilmington, DE 19801 (Attn: Katherine Goode, Esq.); (v) the

Securities and Exchange Commission; (vi) the Internal Revenue Service; (vii) the United States

Attorney's Office for the District of Delaware; (viii) the landlords for each of the Closing Stores,

and (xiii) any other party entitled to notice pursuant to Local Rule 9013-1(m). In light of the

nature of the relief requested herein, the Debtors submit that no other or further notice is

necessary.

## CONCLUSION

**WHEREFORE,** the Debtors respectfully request the entry of an Order, substantially in

the form of the Proposed Order, (i) authorizing the Debtors to enter into the Closing Store

Agreement with the Liquidation Consultant (ii) authorizing the Debtors to conduct Closing Sales

at the Closing Stores in accordance with the Sale Guidelines, with such sales to be free and clear

of all liens, claims, encumbrances, and interests; (iii) approving the Debtors' Store Closing Plan;

(iv) exempting the Debtors from compliance with certain applicable non-bankruptcy laws that

purport to regulate liquidation, similar-themed sales, and signage limitations; (v) exempting the

Debtors from compliance with any contractual restrictions placed upon the Closing Sales; and

669986.5 11/14/2017

(vi) permitting the Debtors to abandon any property of the estates that is burdensome or of inconsequential value or benefit to the estates.

Dated: November 14, 2017
       Wilmington, Delaware

SAUL EWING ARNSTEIN & LEHR LLP

Mark Minuti (DE Bar No. 2659)
Monique B. DiSabatino (DE Bar No. 6027)
1201 N. Market Street, Suite 2300
P.O. Box 1266
Wilmington, DE 19899-1266
Telephone: (302) 421-6840
Facsimile: (302) 421-5873
mark.minuti@saul.com
monique.disabatino@saul.com

-and-

KATTEN MUCHIN ROSENMAN LLP
Peter A. Siddiqui (admitted *pro hac* vice)
Paige E. Barr (admitted *pro hac* vice)
Allison E. Thompson (admitted *pro hac* vice)
525 W. Monroe Street
Chicago, IL 60661
Telephone: (312) 902-5200
Facsimile: (312) 902-1061
peter.siddiqui@kattenlaw.com
paige.barr@kattenlaw.com
allison.thompson@kattenlaw.com

*Attorneys for Debtors*
*and Debtors in Possession*

669986.5 11/14/2017